# FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

DEBORA BARRIENTOS; ARMANDO
BRISENO; BERTHA CARDENAS;
MARTA CHAJON; MANUEL CUEVAS;
FRANCISCO A. DEL CID; MIGUEL
GONZALEZ; JEONG SOON HWANG;
BONG CHA KIM; JAE OK KIM;
LEANNA KIM; NONG-SOON KIM;
YOUNG SUK KIM; MARIA
LANDAVERDE; JANE LEE; JEONG LEE;
SUSAN LEE; YOUNG HEAN LEE; JIN
M. PARK; NORMA ANGELICA PENA;
MARIA RODRIGUEZ; HELEN H. YU,
            *Plaintiffs-Appellees,*

                v.

1801-1825 MORTON LLC,
            *Defendant-Appellant.*

No. 07-56697

D.C. No.
CV-06-06437-ABC-
FMO

OPINION

Appeal from the United States District Court
for the Central District of California
Audrey B. Collins, Chief District Judge, Presiding

Argued and Submitted
March 2, 2009—Pasadena, California

Filed October 9, 2009

Before: Diarmuid F. O'Scannlain, Pamela Ann Rymer, and
Kim McLane Wardlaw, Circuit Judges.

Opinion by Judge Wardlaw

14423

## COUNSEL

Chris J. Evans, Kimball, Tirey & St. John, LLP, Irvine, California, for appellant 1801-1825 Morton LLC.

Michael E. Soloff, Munger, Tolles & Olson, LLP, Los Angeles, California, A. Christian Abasto, Legal Aid Foundation of Los Angeles, Los Angeles, California, and James R. Grow, National Housing Law Project, Oakland, California, for appellees Debora Barrientos, et al.

Rockard J. Delgadillo and Gerald M. Sato, City Attorney's Office, Los Angeles, California, Julie Nepveu, AARP Foundation Litigation, Washington, DC, Helen R. Kanovsky, Nancy D. Christopher, Doris S. Finnerman, William C. Lane, and David M. Reizes, Office of the General Counsel Department of Housing & Urban Development, Washington, DC, and Tony West, Thomas P. O'Brien, Michael S. Raab, and Christine H. Kohl, Office of the Attorney General of the United States, Washington, DC, as amici curiae supporting affirmance.

Karen K. McCay and Stephen D. Pahl, Pahl & McCay, San Jose, C California, as Amicus Curiae supporting reversal.

---

**OPINION**

WARDLAW, Circuit Judge:

1801-1825 Morton LLC ("Morton"), a landlord subject to the Los Angeles Rent Stabilization Ordinance ("LARSO"), Los Angeles Municipal Code §§ 151.01 et seq., served notices of eviction upon tenants whose rent is subsidized by the federal government, because it desired to raise the rent on the apartment units. Though LARSO prohibits eviction for that purpose, Morton asserts that a U.S. Department of Housing and Urban Development ("HUD") regulation permits the eviction of an assisted tenant during the lease term for "good cause" grounds, which "may include [the] desire to lease the unit at a higher rental." 24 C.F.R. § 982.310(d)(1)(iv). We must decide whether HUD's "good cause" regulation preempts the operation of the City of Los Angeles's eviction control ordinance. We hold that it does not. We affirm the district court's grant of summary judgment in favor of the tenants, permanent injunctive relief, and award of attorney's fees.

## I.   FACTUAL AND PROCEDURAL BACKGROUND

### A.   The Federal Assisted Housing Program

The federal government provides rental assistance for low and moderate income families, the elderly, and the disabled through what is known as "the section 8 program." Congress added the section 8 program to the United States Housing Act of 1937 in 1974 by enacting the Housing and Community Development Act of 1974, Pub. L. No. 93-383, § 201(a), 88 Stat. 633, 662-66 (1974) (codified as amended at 42 U.S.C. § 1437f). The express congressional "purpose" of the section 8 program is "aiding low-income families in obtaining a decent place to live and . . . promoting economically mixed housing." 42 U.S.C. § 1437f(a). The program is managed federally by HUD, and administered locally by public housing authorities ("PHA"). Section 8 tenants must sign a lease and pay a portion of their income toward rent. The remainder of the rent charge is paid by PHA pursuant to a housing assistance payment ("HAP") contract between PHA and the owner, which mandates that a lease "shall be for a term of not less than [one] year," *id.* § 1437f(o)(7)(A), shall "contain terms and conditions that . . . are consistent with State and local law," *id.* § 1437f(o)(7)(B)(ii)(I), and "shall provide that during the term of the lease, the owner shall not terminate the tenancy except for serious or repeated violation of the terms and conditions of the lease, for violation of applicable Federal, State, or local law, or for other good cause," *id.* § 1437f(o)(7)(C).

There are two relevant variations of assisted housing tenant-based voucher subsidies. Under the standard housing choice voucher program, the voucher is portable. The tenant may choose to live in any property if the landlord agrees to accept the voucher and comply with the applicable regulations. The government subsidy is limited to the difference between the amount the family is required to contribute and

the payment standard established by PHA based on fair market rents for the area. *Id.* § 1437f(o)(1)(B), (o)(2)(A)-(B).

The second program is called the enhanced voucher program, a recent legislative creation aimed at keeping tenants in their homes despite changing market conditions. Beginning in the 1960s, the federal government subsidized and insured mortgage loans for the construction of housing for assisted tenants ("section 236 program"). *See* Housing and Urban Development Act of 1968, Pub. L. No. 90-448, §§ 201(a), 236(a)-(g), 82 Stat. 476, 498-503 (codified as amended at 12 U.S.C. § 1715z-1 (2000)). Owners of the housing were allowed to prepay their loans after twenty years, at which time they could exit the assisted housing program. 24 C.F.R. § 221.524(a)(ii) (1970). In the 1980s, Congress became concerned that a large proportion of assisted housing would disappear from the market when owners prepaid their section 236 loans. To prevent massive relocation and an inadequate supply of assisted housing, Congress passed a number of laws aimed at restricting the prepayment option. *See* Low Income Housing Preservation and Resident Homeownership Act of 1990, Pub. L. No. 101-625, § 601(a), 104 Stat. 4079, 4249 (1990); Emergency Low Income Housing Preservation Act of 1987, Pub. L. No. 100-242, Title II, 101 Stat. 1815, 1877-91 (1988). In 1999, however, Congress decided to take a different approach. It allowed landlords to prepay their mortgages but increased the available subsidy to fair market value so as to allow the subsidized tenants to remain in the same apartment after prepayment. *See* Pub. L. No. 106-74, § 538, 113 Stat. 1047, 1122-24 (1999) (currently codified as amended at § 1437f(t)).[1] Thus, the enhanced voucher authority provides that "the assisted family may elect to remain in the same project in which the family was residing on the date" the loan was

---

[1]Relevant amendments were enacted by the Military Construction Appropriations Act of 2001, Pub. L. No. 106-246, § 2801, 114 Stat. 511, 569 (2000), to clarify specifically that "the assisted family may elect to remain in the same project" to receive increased government assistance.

prepaid, and that the government will pay the difference between "rent for the dwelling unit" and the tenant's required contribution "during any period the family makes such an election and continues to so reside" even as "rent may be increased from time-to-time." 42 U.S.C. § 1437f(t)(1)(B).

As evidenced by the congressional statement of purpose, Congress and HUD have been perennially concerned about making assisted housing available and affordable, and a key means to that end is the creation of incentives for private owners to participate in the section 8 program. In legislation enacted in 1974, Congress protected tenants from arbitrary eviction by giving the local PHA the "sole right to give notice to vacate" and to evict the tenant. Housing and Community Development Act of 1974, Pub. L. No. 93-383, § 201(a), 88 Stat. 633, 664 (1974); *see also Swann v. Gastonia Hous. Auth.*, 675 F.2d 1342, 1345 n.2 (4th Cir. 1982). In response to owner complaints about this additional burden, HUD proposed in 1978 that Congress harmonize the private and assisted markets by eliminating PHA approval where "State or local law governing evictions affords adequate tenant protection." *Hearings Before the Subcomm. on Hous. & Cmty. Dev. of the Comm. on Banking, Fin. & Urban Affairs*, 95th Cong. 66-67 (1978) (statement of Patricia Harris, HUD Sec'y). Congress refused, noting that "adoption of the proposal would leave section 8 tenants to rely on state and municipal laws for protection, and the committee does not feel that HUD has provided ample information on the extent to which this protection would be sufficient." S. Rep. No. 95-871, at 15 (1978), *reprinted in* 1978 U.S.C.C.A.N. 4773, 4788. To ameliorate the burden on owners within the bounds of existing law, HUD issued a proposed regulation that required PHA to proceed with issuance of the eviction notice in accordance with State and local law as long as grounds to do so existed. 45 Fed. Reg. 72,697, 72,697-99 (Nov. 30, 1980).

In 1981, HUD again proposed that Congress remove the PHA approval requirement and legislate that state and local

law govern assisted tenants' procedural and substantive rights. *Hearings Before the Subcomm. on Hous. & Cmty. Dev. of the Comm. on Banking, Fin. & Urban Affairs*, 97th Cong. 459 (1981). While the Senate agreed to eliminate the PHA requirement and make "procedural and substantive rights of the assisted tenant[s] . . . the same as those applicable to non-subsidized tenants" in order to "encourage more owners to participate," S. Rep. No. 97-139 (1981), *reprinted in* 1981 U.S.C.C.A.N. 396, 552, the House—apparently unsure that state and local law would provide sufficient protection—did not. Congress reached a compromise later that year by eliminating the PHA approval requirement but explicitly amending the Senate's version to add that "the owner shall not terminate the tenancy except for serious or repeated violation of the terms and conditions of the lease, applicable State, local or Federal law, or for other good cause." H.R. Rep. No. 97-208, at 694-95 (1981) (Conf. Rep.), *reprinted in* 1981 U.S.C.C.A.N. 1010, 1053 (codified as amended at 42 U.S.C. § 1437f(d)(1)(B)(ii)). This new condition barring owners from evicting a tenant mid-lease or from refusing to renew a lease without cause became known as the "endless lease" requirement.

HUD issued an interim implementing rule in 1982, withdrawing its earlier regulation permitting termination on thirty days' notice, and specifying that good cause was needed to terminate a tenancy mid-lease or to refuse to renew. 47 Fed. Reg. 33,497, 33,498 (Aug. 3, 1982). It excused the owner from the "good cause" requirement if it wished to withdraw a unit from the section 8 program at the end of the lease term. *Id.* at 33,499. Finally, it expressly refused to define "good cause," providing that "[a]pplication of the statutory standards to particular cases should be determined by the courts" on a case-by-case basis. *Id.*

HUD's final rule, issued in 1984, continued to require "good cause" for all mid-lease terminations and nonrenewals. 49 Fed. Reg. 12,215, 12,231 (March 29, 1984). In addressing

owners' comments about the creation of a " 'perpetual tenancy' terminable only for cause," HUD noted that it "shares the concern that [the new requirement] could reduce the desire of private landlords to offer units for rental under the program," but that "the program options open to [HUD] must accord with the 1981 statutory prohibition of a termination of tenancy in section 8 existing housing other than for statutory good cause grounds." *Id.* It further indicated its desire to keep "[t]enancy requirements . . . as simple as possible, with minimal demands on the owner beyond the normal requirements of an unsubsidized tenancy." *Id.* at 12,233. Finally, it indicated "that a comp[re]hensive regulatory definition of good cause . . . is neither possible nor desirable," and, therefore, "[t]he good cause category should remain open to case by case determination by the courts." *Id.* However, for the first time, HUD chose to provide "examples of 'other good cause,' " including among them "a business or economic reason for termination of the tenancy (such as . . . desire to rent the unit at a higher rental)." *Id.* at 12,233-34. This definition is currently codified at 24 C.F.R. § 982.310(d)(1)(iv), the federal regulation before us.

In 1994, the National Apartment Association commissioned a report by Abt Associates on assisted housing ("Abt Report"). It recommended "making the Section 8 process as similar to regular market operations as possible" by eliminating the "good cause" requirement for nonrenewal and retaining protections provided to all renters in the local jurisdiction. Thereafter, landlord groups pushed for the adoption of the Abt Report's recommendations, including the elimination of the "endless lease" provision, claiming that "[s]ection 8 families should get all the protections that their nonsubsidized friends and neighbors receive but no greater protections." *Hearing on H.R. 2406 Before Subcomm. on Hous. & Cmty. Opportunity of Comm. on Banking, Fin. & Urban Affairs*, 1995 WL 602577 (Oct. 13, 1995) (testimony of Christina L. Garcia, Vice President of Wildwood Mgmt. Group, Inc.).

HUD's 1995 final rule provides that the "good cause" requirement applies "during the term of the assisted lease," but not "after a termination of the assisted lease," 60 Fed. Reg. 34,660, 34,673 (July 30, 1995), and emphasizes that its regulation strikes a "reasonable balance between the interest of the assisted tenant and the owner" because "the lease protects the tenant against arbitrary and ungrounded termination by the owner," while "the owner is not locked in, but may terminate the tenant for lease violation or other good cause," including a "business or economic reason," *id.* at 34,674.

In 1996, Congress repealed the "endless lease" provision by eliminating the "good cause" requirement for nonrenewal, though it retained the requirement for termination of a tenancy during the term of the lease. Pub. L. No. 104-134, § 203(c)(2), 110 Stat. 1321, 1321-281 (1996). In 1998, Congress made the 1996 changes permanent. Pub. L. No. 105-276, §§ 545, 549(a), 112 Stat. 2461, 2596-604, 2607-09 (1998). The current governing statute provides that "during the term of the lease, the owner shall not terminate the tenancy except for serious or repeated violation of the terms and conditions of the lease, for violation of applicable Federal, State, or local law, or for other good cause." 42 U.S.C. § 1437f(o)(7)(C). In 1999, HUD issued final implementing regulations, leaving its definition of "good cause" unchanged. 64 Fed. Reg. 56,894 (Oct. 21, 1999). Thus, the relevant HUD regulation currently provides that " '[o]ther good cause' . . . may include, but is not limited to . . . [a] business or economic reason for termination of the tenancy (such as sale of the property, renovation of the unit, or desire to lease the unit at a higher rental)." 24 C.F.R. § 982.310(d)(1)(iv). The regulations also provide that "[d]uring the initial lease term, the owner may not terminate the tenancy for 'other good cause,' . . . based on . . . a business or economic reason," *id.* § 982.310(d)(2), and that the initial lease term must be at least one year, *id.* § 982.309(a)(1).

**B.    LARSO**

The City of Los Angeles adopted LARSO in 1979. It is a comprehensive rent and eviction control ordinance, which creates an exception to the general rule allowing "no-cause" terminations at the end of a lease term. Its express purpose is to "regulate rents so as to safeguard tenants from excessive rent increases, while at the same time providing landlords with just and reasonable returns from their rental units." L.A. Mun. Code § 151.01. Under LARSO, landlords and tenants may set the initial terms of the tenancy, including the rental rate, *id.* at § 151.06C, but thereafter, the landlord may only increase the rent in small increments each year, absent special permission, *id.* § 151.06D. Most importantly, LARSO restricts possible grounds for eviction to thirteen enumerated reasons, including violation of material terms of the lease, damage to property, or criminal activity. *Id.* § 151.09A(1)-(7). The only business-related reasons are renovation, removal of the unit from the rental market, or placement of a family member or resident manager into the unit. *Id.* § 151.09A(8)-(11). Expiration of the lease term or the desire to raise rent to current market levels with a new tenant are not permissible grounds for eviction. Through "vacancy decontrol," however, when a tenant voluntarily leaves or is lawfully evicted, the landlord may raise the rent to market levels. *Id.* § 151.06C. Though some public housing is exempt, LARSO specifically applies to "rental units for which rental assistance is paid pursuant to the Housing Choice Voucher Program codified at 24 CFR part 982." L.A. Mun. Code § 151.02 Rental Units (5).

**C.    Factual and Procedural Background**

The parties have stipulated to the relevant facts. Appellees are twenty-two low-income tenants ("Tenants") residing in "Morton Gardens," an apartment complex in Los Angeles, California, managed by Appellant 1801-1825 Morton LLC. All Tenants reside in apartments covered by LARSO. The

building of Morton Gardens was financed through a section 236 loan, which was prepaid in 1998. Sixteen of the Tenants were residing in Morton Gardens at that time and received enhanced voucher subsidies ("Enhanced Voucher Tenants"). The other six Tenants, who moved into Morton Gardens after the prepayment, rent their apartments with the standard housing choice vouchers ("Standard Voucher Tenants"). The Housing Authority for the City of Los Angeles ("HACLA") administers Tenants' subsidies pursuant to HAP contracts with Morton.

On March 31, 2006, Morton served each Tenant with a Notice of Withdrawal from Section 8 Assisted Housing Program and Notice of Change in Terms of Your Tenancy, informing Tenants of its intention to "remove the Subject Premises from the Federally Assisted Section 8 Housing Program" and "to rent the unit at market rents" ("Withdrawal Notices"). Responding to Tenant complaints, HACLA and the Los Angeles Housing Department informed Morton that, absent the Tenants' consent, the HAP contracts could be terminated only upon lawful eviction of the Tenants under state and local law. Morton therefore rescinded the Withdrawal Notices and issued Ninety Day Notices to Terminate Tenancy ("Eviction Notices"). The Eviction Notices informed Tenants that

> [t]he grounds for termination of your tenancy are based upon paragraph 8 of your housing assistance payments contract and 24 CFR 982.310(d)[(1)](iv), which allows the landlord to terminate the rental agreement for a business or economic reason, including but not limited to, the desire to opt-out of the Tenant Based Section 8 Program and or the desire to lease the unit at a higher rental rate. Prior to the service of this notice, the landlord made a business decision to no longer participate in the Section 8 voucher program for your unit.

Tenants filed this action in the U.S. District Court for the Central District of California, seeking a declaratory judgment that the Eviction Notices violated federal law and LARSO, and a permanent injunction barring unlawful eviction of Tenants. The parties stipulated to a preliminary injunction. The district court granted summary judgment to Tenants, entered a permanent injunction barring Morton from evicting Tenants without complying with LARSO and the enhanced voucher provisions, denied Morton's motion for reconsideration, and granted Tenants attorney's fees. Morton timely appeals.[2]

## II.   JURISDICTION AND STANDARDS OF REVIEW

The district court exercised jurisdiction under 28 U.S.C. §§ 1331 and 1367(a). We have jurisdiction under 28 U.S.C. § 1291. We review a grant of summary judgment de novo. *Lovell v. Chandler*, 303 F.3d 1039, 1052 (9th Cir. 2002). We review a grant of permanent injunctive relief for abuse of discretion, *Ting v. AT&T*, 319 F.3d 1126, 1134-35 (9th Cir. 2003), and an award of attorney's fees for abuse of discretion, *Tahara v. Matson Terminals, Inc.*, 511 F.3d 950, 952 (9th Cir. 2007), reviewing factual findings for clear error, and legal conclusions de novo, *Ting*, 319 F.3d at 1134-35; *Tahara*, 511 F.3d at 952.

---

[2]Because our analysis turns on the construction of a HUD regulation, following oral argument we invited HUD to express its position on the following question:

> Do local eviction controls, such as the Los Angeles Rent Stabilization Ordinance, L.A. Mun. Code section 151.09A, pose an obstacle to the accomplishment and execution of the full purposes and objectives of HUD's definition of "good cause" to terminate assisted tenancies as including the desire to raise rents, set forth in 24 C.F.R. § 982.310(d)[(1)](iv)?

The United States, appearing on behalf of HUD through the U.S. Department of Justice, filed a Brief for the United States as Amicus Curiae Supporting Affirmance of the District Court's Judgment.

## III.  DISCUSSION

The district court granted summary judgment to Tenants, concluding that the Eviction Notices violated the Enhanced Voucher Tenants' statutory right to remain in their apartments despite rent increases under § 1437f(t)(1)(B),[3] that LARSO and HUD are in actual conflict, but that HUD's definition of "good cause," insofar as it includes the desire to raise the rent, exceeded HUD's statutory authority.[4] We affirm summary judgment and the entry of the permanent injunction on somewhat different grounds. *See Sec. Life Ins. Co. of Am. v. Meyling*, 146 F.3d 1184, 1190 (9th Cir. 1998) (per curiam) ("[W]e can affirm on any ground supported by the record."). Though we agree that the eviction violated the Enhanced Voucher Tenants' right to remain, we hold that LARSO is not preempted by HUD's "good cause" regulation because it does not actually conflict with the federal regulation.

---

[3]The district court had ruled that the Enhanced Voucher Tenants were protected from eviction by § 1437f(t)(1)(B) itself, which "ensured that assisted families could remain in tenancy, even when the owner exits the assistance program." Judge Wardlaw would affirm this holding, which provides an additional layer of protection to the Enhanced Voucher Tenants over that provided by LARSO. Judges O'Scannlain and Rymer would not reach the statutory right to remain issue, because under the particular facts of this case, LARSO precludes eviction for the purpose of rent increases.

[4]The district court's judgment assumes that Morton intended to terminate the tenancies for the sole purpose of raising the rent. In its motion for reconsideration, Morton argued that it was also motivated by the desire to rid itself of various section 8 compliance costs. The district court rejected this late assertion, finding that Morton put forth no evidence of compliance costs, but that in any case, a bare desire to leave the section 8 program does not constitute "good cause." On appeal, Morton does not dispute that both sets of Notices were solely motivated by its desire to raise the rent. Nor does Morton address the district court's finding that a bare desire to withdraw from the program cannot constitute "good cause." Therefore, we also assume that Morton's only reason for eviction was the desire to raise the rent.

## A.    Federal Preemption of LARSO

The district court held that LARSO actually conflicts with HUD's "good cause" regulation because "it takes away a right specifically granted by the HUD regulation." It granted summary judgment to Tenants, however, because it concluded that HUD's definition of "good cause"—insofar as it includes the desire to raise the rent—was "unreasonable" and "manifestly contrary" to the statute, and therefore exceeded HUD's authority. We do not agree that LARSO and the HUD regulation actually conflict. The HUD regulation does not create a "right" to evict tenants to raise the rent that LARSO takes away. The HUD regulation merely creates a floor of protection, which local laws may enhance. Thus, although we disagree with the district court's preemption analysis, we do agree that LARSO controls Morton's ability to evict Tenants when Morton desires to raise the rent.

[1] The preemption doctrine is rooted in the Supremacy Clause of the U.S. Constitution. U.S. Const., art. VI, cl. 2. "[T]he purpose of Congress is the ultimate touchstone in every preemption case." *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996) (alteration and internal quotation marks omitted). Morton does not suggest that Congress expressly preempted state law or intended federal law exclusively to occupy the field of lease terminations. *See English v. Gen. Elec. Co.*, 496 U.S. 72, 78-79 (1990). State law, however, is also "nullified to the extent that it actually conflicts with federal law." *Fid. Fed. Sav. & Loan Ass'n v. de la Cuesta*, 458 U.S. 141, 153 (1982). "Such a conflict arises when compliance with both federal and state regulations is a physical impossibility or when state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Id.* (citation and internal quotation marks omitted); *see also Wyeth v. Levine*, 129 S. Ct. 1187, 1193-94 (2009).

Along with Congress, "a federal agency acting within the scope of its congressionally delegated authority may pre-empt

state regulation." *City of N.Y. v. FCC*, 486 U.S. 57, 63-64 (1988) (internal quotation marks omitted). Thus, when "Congress has entrusted an agency with the task of promulgating regulations to carry out the purposes of a statute, . . . as part of the pre-emption analysis we must consider whether the regulations evidence a desire to occupy a field completely." *R.J. Reynolds Tobacco Co. v. Durham County, N.C.*, 479 U.S. 130, 149 (1986) (citation omitted). However, a reviewing court does not "focus on Congress' intent to supersede state law" because "[a] pre-emptive regulation's force does not depend on express congressional authorization to displace state law." *de la Cuesta*, 458 U.S. at 154. Instead, the court asks "whether the [federal agency] meant to pre-empt [the state law], and, if so, whether that action is within the scope of the [federal agency's] delegated authority." *Id.* When one "of the responsibilities conferred on federal agencies involve[s] a broad grant of authority to reconcile conflicting policies," the court must uphold the federal regulation "if the agency's choice to pre-empt represents a reasonable accommodation of conflicting policies that were committed to the agency's care by the statute." *City of N.Y.*, 486 U.S. at 64 (internal quotation marks omitted). The regulation is invalid if "it appears from the statute or its legislative history that the accommodation is not one that Congress would have sanctioned." *Id.* (internal quotation marks omitted).

"Pre-emption should not be inferred . . . simply because the agency's regulations are comprehensive." *R.J. Reynolds Tobacco Co.*, 479 U.S. at 149. Federal regulations have "to be sufficiently comprehensive to authorize and govern programs in States which [have] no requirements of their own as well as cooperatively in States with such requirements." *Hillsborough County, Fla. v. Automated Med. Labs., Inc.*, 471 U.S. 707, 717 (1985) (alteration and internal quotation marks omitted). As the Supreme Court stated, "merely because the federal provisions were sufficiently comprehensive to meet the need identified by Congress did not mean that States and

localities were barred from identifying additional needs or imposing further requirements in the field." *Id.*

**[2]** The presumption against preemption applies here. When "Congress has legislated in a field which the States have traditionally occupied, we start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress." *Wyeth*, 129 S. Ct. at 1194-95 (alterations and internal quotation marks omitted). The City of Los Angeles has " 'traditionally strong interests in local rent control.' " *Topa Equities, Ltd. v. City of L.A.*, 342 F.3d 1065, 1071 (9th Cir. 2003) (quoting *Kargman v. Sullivan*, 552 F.2d 2, 6 (1st Cir. 1977)). Morton is required to demonstrate "a conflict between a particular local provision and the federal scheme, that is strong enough to overcome the presumption that state and local regulation of [local rent control] matters can constitutionally coexist with federal regulation." *Hillsborough County*, 471 U.S. at 716; *see also Geier v. Am. Honda Motor Co., Inc.*, 529 U.S. 861, 885 (2000) ("[A] court should not find pre-emption too readily in the absence of clear evidence of a conflict.").

Applying *de la Cuesta*, we consider whether the agency intended to preempt the local law and whether LARSO stands as an obstacle to the accomplishment of Congressional purposes.

### 1. HUD Did Not Intend to Preempt Local Eviction Controls

**[3]** In reaching its conclusion that "HUD never explicitly intended to preempt state and local eviction restrictions," the district court found that the "central purpose" of the " 'good cause' regulation" was "to mirror the private rental market so as to encourage owner participation." That conclusion is supported by both the language and the legislative history of the "good cause" regulation. When HUD prompted Congress to

eliminate the requirement of PHA approval for eviction in 1978 and 1981, it sought to make assisted tenancies as similar to unassisted tenancies as possible. Similarly, when Congress instituted the "other good cause" requirement in 1981, HUD initially declined to define "good cause," instead providing that "[a]pplication of the statutory standards to particular cases should be determined by the courts, normally in the course of the eviction proceeding brought by the owner." 47 Fed. Reg. at 33,499.

**[4]** When HUD did create the "good cause" definition, it again reassured owners that it was trying to make assisted tenancies "as simple as possible, with minimal demands on the owner beyond the normal requirements of an unsubsidized tenancy," or as similar to the private market as possible. 49 Fed. Reg. at 12,233. It explained that "a comp[re]hensive regulatory definition of good cause . . . is neither possible nor desirable." *Id.* Thus, it emphasized that its definition constituted only "examples" of "cases that *may* be good cause" and reiterated its position that "[t]he good cause category should remain open to case by case determination by the courts." 60 Fed. Reg. at 34,673 (emphasis added) (internal quotation marks omitted). Nothing in this language indicates that HUD intended to prevent certain state laws from operating in such case-by-case determinations in state courts.

**[5]** It is true that no regulation expressly allows the operation of local eviction controls on assisted tenancies, while a HUD regulation expressly subjects section 8 rent reasonableness determinations to local rent control. *See* 24 C.F.R. § 982.509. That regulation, however, is a specific directive to local PHAs in setting reasonable rent. The lack of a similar express directive to state courts to apply local eviction controls in determining whether good cause exists to evict assisted tenants, aside from the questionable permissibility of such a directive, does not itself suggest that state courts should reject local eviction controls. In fact, the preemption of LARSO would nullify 24 C.F.R. § 982.509, because an

owner would be able to escape rent control by evicting tenants in order to raise their rent. In other words, as Tenants persuasively argue, the preemption of local eviction controls by HUD's "good cause" regulation would lead to absurd results in a vacancy decontrol jurisdiction like California, because it would make assisted tenants special victims of eviction by landlords desiring to take advantage of vacancy decontrol to raise rents. We refuse to construe "[l]egislative enactments . . . as establishing statutory schemes that are illogical, unjust, or capricious." *Bechtel Constr., Inc. v. United Bhd. of Carpenters*, 812 F.2d 1220, 1225 (9th Cir. 1987). Thus, the district court correctly held that HUD did not specifically intend to preempt local eviction laws with its "good cause" regulation.

### 2.  *The HUD Regulation and LARSO Do Not Actually Conflict*

We disagree with the district court's conclusion that the HUD regulation and LARSO actually conflict. The HUD regulation does not grant a right to terminate a tenancy based on a desire to increase rents. Nor does LARSO otherwise present an obstacle to the accomplishment of federal objectives.[5]

[6] The goals of the HUD regulation and LARSO, as expressed in the purposes of each governing statute, are the same—to increase the availability and affordability of housing. *Compare* 42 U.S.C. § 1437f(a), *with* L.A. Mun. Code § 151.01. Morton argues that HUD's goal in defining "good cause" was to encourage owner participation in the section 8 program, an objective not found in LARSO.[6] This argument

---

[5]Morton does not argue on appeal that it is physically impossible to comply with both the HUD regulation and LARSO.

[6]The district court agreed with Morton that "when enacting LARSO, the City had no concern for encouraging owner participation in the section 8 program." Though we need not resolve this question because we hold that the primary goals of the HUD regulation and LARSO are compatible, we note that nothing in the record suggests that the City of Los Angeles was unaware of concerns regarding the availability of section 8 housing.

is illogical, however, as HUD and Congress have deemed owner participation an important means to the ultimate end of providing housing, but not a goal in itself. Thus, while HUD may have listed examples of "good cause" in order "to provide explicit regulatory assurance to prospective section 8 owners that legitimate owner concerns will be recognized as grounds for termination of tenancy," 49 Fed. Reg. at 12,233, the fact remains that the same regulation specified that "good cause is determined in local landlord tenant courts," *id.* at 12,234. Any agency assurance that it considers the desire to raise the rent as "good cause" to terminate a lease is, by the very terms of the regulation, necessarily subject to case-by-case evaluation by state courts, which are also required to apply local law.

**[7]** As evidenced by a variety of legislative enactments, such as the now-repealed provision for PHA approval of evictions and the "good cause" requirement at issue here, Congress and HUD intended to provide assisted tenants with more protections than unassisted tenants, not less. Congress only rejected the application of substantive state and local law to section 8 lease terminations when asked to eliminate federal controls over such terminations altogether. *Compare* S. Rep. 97-139 (1981), *reprinted in* 1981 U.S.C.C.A.N. 396, 552, *with* H.R. Rep. 97-208, at 694-95 (1981) (Conf. Rep.), *reprinted in* 1981 U.S.C.C.A.N. 1010, 1053-54. Thus, it refused to allow substantive state and local law to supplant wholly federal termination standards. By enacting the federal good cause requirement, it desired to maintain a uniform federal floor below which protections for tenants could not drop, not a ceiling above which they could not rise. Importantly, Congress and HUD never explicitly rejected the application of more protective local standards to assisted tenants, and, in certain cases, expressly allowed for it. *See, e.g.*, 42 U.S.C. § 1437f(o)(7)(D)(vi) ("[N]othing in this section shall be construed to supersede any provision of any Federal, State, or local law that provides greater protection than this section for victims of domestic violence . . . ."); 24 C.F.R. § 982.53(d)

("Nothing in part 982 is intended to pre-empt operation of State and local laws that prohibit discrimination against a Section 8 voucher-holder because of status as a Section 8 voucher-holder.").

In determining whether a state law presents an "obstacle" to the full implementation of a federal law, however, "it is not enough to say that the ultimate goal of both federal and state law" is the same. *Int'l Paper Co. v. Ouellette*, 479 U.S. 481, 494 (1987). "A state law also is pre-empted if it interferes with the methods by which the federal statute was designed to reach this goal." *Id.*

For example, in *de la Cuesta*, a federal regulation permitted the inclusion of due-on-sale clauses in mortgages (allowing lenders to make the entire loan immediately payable upon transfer of property), and expressly stated that it preempted state laws to the contrary. 458 U.S. at 146-47. California courts had created a state law doctrine to the contrary. *Id.* at 149. In addition to concluding that the federal regulation expressly preempted the state doctrine, the Supreme Court found that the two actually conflicted. *Id.* at 155. It held that while compliance with both was not physically impossible because the federal regulation only permitted, and did not require, the conduct that the state doctrine forbade, the state doctrine presented an obstacle to the federal objective because the state courts "have deprived the [regulated party] of the 'flexibility' given it by the" federal regulations. *Id.*

By contrast, in *Chevron U.S.A., Inc. v. Hammond*, 726 F.2d 483 (9th Cir. 1984), owners of oil tankers challenged a state regulation forbidding the discharge of any ballast water—clean or dirty—near the state's shores, claiming that it was preempted by federal agency regulations that expressly permitted the discharge of clean ballast water close to shore. *Id.* at 485-86. We found no actual conflict because the goals of the two regulations were the same, *id.* at 496, and because it was not physically impossible to comply with both, *id.* at 499.

We recognized that "the state law prohibits acts that the federal regulations allow but do not require." *Id.* at 498. We further noted that "[a] finding of preemption is particularly inappropriate when the state is regulating conduct permitted by federal regulation, but only as an exception to a broad federal prohibition." *Id.* (citing *Exxon Corp. v. Governor of Md.*, 437 U.S. 117, 132 (1978)). We then distinguished *de la Cuesta*, on the ground that in *Hammond*, "the state is merely eliminating one exception to a general federal prohibition, rather than asserting authority over an area in direct conflict with overriding federal policy." *Id.* at 498 n.19.

The district court reasoned "that this case presents a question more like the one in *de la Cuesta* than in *Hammond*," because, as in *de la Cuesta*, where the state deprived owners of the flexibility in choosing whether to utilize the due-on-sale clauses, LARSO deprived owners of the flexibility in choosing whether to terminate tenants in order to increase the rent. *de la Cuesta* and *Hammond*, however, suggest the opposite reading. The federal agency in *Hammond* set forth an exception (clean discharge permissible) to a federal prohibition (no discharge), that the state law took away. Similarly, HUD set forth an exception (termination to increase the rent permissible) to a federal prohibition (no termination without good cause), that LARSO took away. On this reading, this case is more like *Hammond* and less like *de la Cuesta*, in which the federal agency permitted an action (inclusion of due-on-sale clauses) that the state forbade. In addition, the *de la Cuesta* Court relied heavily on the "unambiguous" intent of the federal agency to preempt contrary state law. 458 U.S. at 154-59; *see also id.* at 158 ("The preamble unequivocally expresses the Board's determination to displace state law."). That sort of unambiguous intent, as explained above, is not present here. Further, the district court's finding of conflict was based on its conclusion that "LARSO takes away a right specifically granted by the HUD eviction regulations." However, as in *Hammond*, where it was "difficult to argue convincingly that the Congress or the Coast Guard intended to

create a federal right to discharge ballast containing oil into a state's coastal waters," 726 F.2d at 499, it is similarly difficult to argue, given the statutory context and legislative and administrative history, that Congress or HUD intended to create a "federal right" to terminate assisted tenants in order to raise the rent on their units.

**[8]** Moreover, LARSO conflict preemption arguments have failed in two previous federal cases. In *Topa Equities*, owners challenged the 1990 Amendments to LARSO, which set the maximum rent subsequent to an owner's exit from the federal program at the amount last charged under the federal program, thereby preventing vacancy decontrol and prohibiting owners from raising the rent to market level. 342 F.3d at 1068-69. As here, owners argued that LARSO is conflict-preempted by federal law because it impedes federal objectives by disincentivizing private owner participation in section 8 housing. We found that LARSO was not actually preempted because "[n]othing in the HUD regulations purports to limit states from enacting their own rent control laws of general applicability." *Id.* at 1072. In concluding that " 'federal legislation creating the network of subsidized housing laws is superimposed upon and consciously interdependent with the substructure of local law relating to housing,' " we placed special emphasis on the fact that "Congress never indicated—in either the text or legislative history of the [National Housing Act of 1934, ch. 847, 48 Stat. 1246 (codified as amended at 12 U.S.C. §§ 1701-49)] or in any ancillary statute—that it intended to abrogate state rent control laws." *Topa Equities*, 342 F.3d at 1072 (quoting *Kargman*, 552 F.2d at 11). Thus, we held that "LARSO is a generally applicable rent control ordinance that does not unduly interfere with federal housing programs. It is not expressly preempted by federal law, nor is it preempted on conflict grounds."[7] *Id.* at 1067.

---

[7]In a case factually distinguishable from ours (it did not concern a generally applicable state or local law), the Eighth Circuit held that "[a]ny

In *Independence Park Apartments v. United States*, 449 F.3d 1235 (Fed. Cir. 2006), owners successfully argued that the government's temporary withdrawal of their right to prepay section 236 loans constituted a regulatory taking and were awarded damages. *Id.* at 1238. The government argued that the damages award should be reduced because after exiting the federal program, owners would not be able to raise the rent due to LARSO, and landlords responded that LARSO was inapplicable because it was conflict-preempted by Congress's desire to incentivize private development of low-income housing. *Id.* at 1243. The Federal Circuit rejected the owners' preemption argument. Applying the presumption against preemption of traditionally local laws, it held that the government made no guarantees about the effect of local laws on profitability and so did not intend to preempt the operation of more protective local laws. *Id.* at 1243-44. "The National Housing Act provided certain benefits and imposed certain burdens on owners of subsidized low-income housing. It did not, however, provide them with any protection against the

state statute that forces owners to remain in a federally subsidized program from which Congress has authorized withdrawal would eviscerate the method Congress chose to implement the federal low-income housing scheme." *Forest Park II v. Hadley*, 336 F.3d 724, 733-34 (8th Cir. 2003). In *Forest Park II*, owners who wished to prepay their section 236 mortgage as expressly permitted by the 1999 Veteran Affairs & HUD Appropriations Act, Pub. L. No. 105-276, § 219(b)(3), 112 Stat. 2461, 2488 (1998), challenged additional procedural requirements embodied in state statutes applicable to landlords of federally subsidized rental housing. The Eighth Circuit held that the state statutes were expressly and impliedly preempted by federal law permitting repayment, reasoning that the "further requirement imposed by a state statute would directly interfere with Congress's original intent of offering prepayment as an incentive." *Forest Park II*, 336 F.3d at 733. Here, however, LARSO does not directly interfere with a federal agency regulation, because HUD explicitly left the "good cause" determination up to state courts for case-by-case analysis, and LARSO simply provides the relevant local law that the courts apply in eviction proceedings. Furthermore, while the state laws at issue in *Forest Park II* were aimed specifically at participants in federal housing programs, LARSO is a background law of general applicability.

application of a variety of state and local laws that could affect the profitability of their investments." *Id.* at 1244.

**[9]** Although *Topa Equities* and *Independence Park Apartments* concerned a different federal housing statute, it follows from the reasoning in those decisions that the operation of LARSO in conjunction with federal housing laws does not impede federal objectives.

### 3. The Litigation Position of HUD and Recent HUD Regulations Support a Finding of Nonpreemption

**[10]** Responding to our invitation to HUD to express its view on whether LARSO's eviction controls actually conflict with 24 C.F.R. § 982.310(d)(1)(iv), the United States informs us that "LARSO's eviction controls do not pose an obstacle to the accomplishment and execution of the full purposes and objectives of HUD's regulation providing that 'other good cause' for terminating a Section 8 tenancy 'may'—but does not necessarily—include a landlord's desire to raise the rent." In support of its position, the United States first notes that the statutory language and its own regulations expressly contemplate the interdependence of federal assisted housing law and state and local housing law: 42 U.S.C. § 1437f(o)(7)(B)(ii)(I) provides that the lease must contain terms that are "consistent with State and local law"; § 1437f(o)(7)(E) mandates that the HAP contract "shall provide" that "any relief [from termination] shall be consistent with applicable State and local law"; 24 C.F.R. § 982.308(c) allows PHA the right to "decline to approve the tenancy if the PHA determines that the lease does not comply with State or local law"; and § 982.310(e)(2)(i) requires section 8 owners to use the eviction notice "used under State or local law." Second, the United States highlights the use of "may" in 24 C.F.R. § 982.310(d)(1), which provides that " '[o]ther good cause' for termination of tenancy by the owner *may* include, but is not limited to, any of the following examples." It notes that " '[m]ay' is permissive and connotes discretion, absent clear indication to the contrary."

Brief for the United States as Amicus Curiae supporting affirmance of the district court (citing *Fernandez v. Brock*, 840 F.2d 622, 632 (9th Cir. 1988)). Third, the United States argues that "[n]either the wording nor the intent of [24 C.F.R. § 982.310] gives a landlord an unqualified 'right' to terminate a Section 8 tenancy because he wants to raise the rent," as the regulation utilizes "general terms" and intentionally leaves the determination of "good cause" to the courts "on a case-by-case basis." Finally, the United States assures us that "HUD has never interpreted 24 C.F.R. § 982.310 as prohibiting state and local governments from providing additional protection from eviction to tenants."

Moreover, a recently published HUD guidance document, Notice PIH 2009-18 (HA), State and Local Law Applicability to Lease Terminations in the Housing Choice Voucher (HCV) Program, § 3 (June 22, 2009), mirrors the litigation position expressed in the amicus brief of the United States. It states that "while good cause 'may include' a business or economic reason (e.g., [when] there is no State or local law prohibiting termination of tenancy for such cause), in other circumstances it may *not* include a business or economic reason." *Id.* "If a State or local law prohibits the termination o[f] tenancy for a business or economic reason such as a desire to lease the unit at a higher rental, the[n] that specific ground[ ] for termination of the tenancy does not constitute 'other good cause' under 24 CFR [§ ] 982.310(d) in that particular instance." *Id.* In conclusion, HUD dictates that "nothing in 24 CFR [§ ] 982.310(d)(1) pre-empts any applicable State or local laws that restrict or prohibit the termination of tenancy. This applies to all HCV vouchers." *Id.*

**[11]** The position of the United States is entitled to deference, as is HUD's most recent guidance document. "[W]hen an agency invokes its authority to issue regulations, which then interpret ambiguous statutory terms, the courts defer to its reasonable interpretations." *Fed. Express Corp. v. Holowecki*, 128 S. Ct. 1147, 1154 (2008). "[T]he agency is entitled

to further deference when it adopts a reasonable interpretation of regulations it has put in force." *Id.* at 1155 (citing *Auer v. Robbins*, 519 U.S. 452, 461 (1997) (deferring to the agency's position unless it is "plainly erroneous or inconsistent with the regulation" (internal quotation marks omitted))). Further, an agency's litigation position in an amicus brief is entitled to deference if there is "no reason to suspect that the interpretation does not reflect the agency's fair and considered judgment on the matter." *Auer*, 519 U.S. at 462. And, as explained above, the interpretive policy statements are at least "entitled to a measure of respect under the less deferential *Skidmore* standard." *Fed. Express Corp.*, 128 S. Ct. at 1156 (internal quotation marks omitted). Of course, we do not defer "to an agency's *conclusion* that state law is pre-empted. Rather, we have attended to an agency's explanation of how state law affects the regulatory scheme." *Wyeth*, 129 S. Ct. at 1201. Agencies "have a unique understanding of the statutes they administer and an attendant ability to make informed determinations about how state requirements may pose an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Id.* (internal quotation marks omitted); *see also Sprietsma v. Mercury Marine*, 537 U.S. 51, 68 (2002); *Geier*, 529 U.S. at 883. Moreover, while "[t]he weight we accord the agency's explanation of state law's impact on the federal scheme depends on its thoroughness, consistency, and persuasiveness," *Wyeth*, 129 S. Ct. at 1201, HUD has amply demonstrated its thoughtful consideration of, and its commitment to, the principle that local eviction control laws that are more protective of tenants are not preempted by its own "good cause" regulation.

**[12]** Our independent analysis of the statutory language and legislative history, the persuasive reasoning of prior LARSO decisions by us and the Federal Circuit, the litigation position of the United States, and HUD's most recent publication lead us to conclude that the HUD regulation and LARSO do not actually conflict. LARSO does not impede the federal objective of providing affordable housing to low-income families.

LARSO, therefore, is not preempted by 24 C.F.R. § 982.310(d)(1)(iv) to the extent the HUD regulation permits eviction in order to obtain a higher rental, in the absence of contrary state or local law.[8]

## B.  Injunction Issued by the District Court

The district court granted summary judgment to Tenants on the ground that although the HUD regulation and LARSO actually conflict, HUD's regulation exceeded the federal agency's statutory authority. Because we hold there is no actual conflict between LARSO and the HUD regulation, we do not reach the question of whether promulgation of the regulation was within HUD's authority.[9] Though we disagree with the district court's reasoning, because we may affirm the district court's judgment "on any ground supported by the record," *Sec. Life Ins. Co. of Am.*, 146 F.3d at 1190, we affirm the grant of summary judgment and the permanent injunction entered by the district court.

Morton also challenges the scope of the injunction, arguing that it must be limited to proscribing it from terminating Tenants in order to raise the rent. The district court enjoined "Defendant and any of its agents from failing to allow the Enhanced Voucher Plaintiffs to remain at Morton Gardens with enhanced voucher assistance," and "from evicting or terminating the tenancy or lease of all Plaintiffs without comply-

---

[8]Amicus California Apartments Association argues that LARSO is preempted by California Civil Code § 1954.535, an issue not raised by Morton on appeal. Morton has thus waived the issue, *see United States v. Gementera*, 379 F.3d 596, 607-08 (9th Cir. 2004), and we typically "do not consider on appeal an issue raised only by an amicus." *Engine Mfrs. Ass'n v. S. Coast Air Quality Mgmt. Dist.*, 498 F.3d 1031, 1043 (9th Cir. 2007) (internal quotation marks omitted). Accordingly, we do not address Amicus's argument on the merits.

[9]Because we do not affirm the district court's invalidation of HUD's regulation, we need not decide whether the district court's decision on that ground should be applied only prospectively.

ing with all the requirements of [LARSO]." Tenants respond that Morton did not object to the scope of the injunction before the district court and, therefore, has waived the objection. *See Ritchie v. United States*, 451 F.3d 1019, 1026 n.12 (9th Cir. 2006) (concluding that failure to raise an issue before the district court waives it on appeal when the issue involves an exercise of the district court's discretion and the district court "might have been able to deal with the problem"); *see also Conn. Gen. Life Ins. Co. v. New Images of Beverly Hills*, 321 F.3d 878, 883 (9th Cir. 2003) ("This issue is . . . raised for the first time on appeal, and we cannot entertain the argument because further factual development would be required."). We agree with Tenants that Morton waived the objection to the scope of relief by failing to raise it before the district court. Accordingly, we decline to address it.

## C.    Attorney's Fees

[13] The district court awarded Tenants attorney's fees in the amount of $180,029.50, based on an attorney's fees provision contained in their leases. California Civil Code § 1717(a) authorizes reasonable attorney's fees "[i]n any action on a contract, where the contract specifically provides that attorney's fees and costs, which are incurred to enforce the contract, shall be awarded either to one of the parties or to the prevailing party." The provision is interpreted liberally. *See Lafarge Conseils Et Etudes, S.A. v. Kaiser Cement & Gypsum Corp.*, 791 F.2d 1334, 1340 n.16 (9th Cir. 1986).

[14] Morton contends that Tenants' action is not an "action on a contract" because Tenants sued to enforce their rights under federal housing law and LARSO. We disagree. In *Lafarge*, we awarded attorney's fees to the plaintiff for opposing the defendant's motion to vacate an arbitration award, which was based on a contract. We held that "the underlying contract between the parties is not collateral to the proceedings but plays an integral part in defining the rights of the parties." *Id.* at 1340. By contrast, in *In re Johnson*, 756 F.2d 738

(9th Cir. 1985), relied upon by Morton, we refused to award debtors attorney's fees for opposing the creditors' unsuccessful motion for relief from an automatic stay. We held that because the "[s]tay litigation is limited to issues of the lack of adequate protection, the debtor's equity in the property, and the necessity of the property to an effective reorganization," "[t]he validity of the . . . contract underlying the claim is not litigated during the hearing." *Id.* at 740. Here, Tenants' lease contracts are not collateral to the litigation because they incorporate and define the rights and obligations of Tenants and Morton, the applicability of relevant federal and state law, and the role of federal and state actors. Thus, Tenants' action for a declaratory judgment regarding their right to remain in their apartments is properly considered an action "on a contract." As the district court noted, Tenants' "complaint was one to enforce their rights as tenants under the lease."

[15] Morton further argues that the district court erred in awarding fees to all Tenants because there were two different fee provisions in the leases, and certain Tenants failed to provide copies of their leases. The district court correctly found that "[t]he 17 leases offered into evidence by Plaintiffs are sufficient to establish entitlement to fees for all Plaintiffs."[10] The merits issues concerning all Tenants were "so factually interrelated that it would have been impossible to separate the activities into compensable and noncompensable time units." *Cruz v. Ayromloo*, 66 Cal. Rptr. 3d 725, 730 (Ct. App. 2007) (alteration and internal quotation marks omitted). Considering that there is no meaningful difference between the relevant portions of the two fee provisions on record, and the lack of

---

[10]Fifteen Tenants submitted leases providing that "[i]f any legal action or proceeding be brought by either party to enforce any part of this Agreement, the prevailing party shall recover . . . reasonable attorney fees and costs." Two Tenants submitted leases providing that "[i]f any legal action or proceeding be brought by either party to enforce any part of this Agreement, the prevailing party shall recover . . . reasonable costs, including attorney's fees." Five Tenants did not submit their leases because they no longer have copies of them, and Morton refused to provide the originals.

evidence that the five leases not in evidence contained materially different fee provisions, we affirm the district court's conclusion.

[16] Morton also argues that the district court abused its discretion by failing to hold an evidentiary hearing on the reasonableness of fees. The district court properly concluded that Morton, without reason or justification, failed to submit any evidence opposing the Tenants' contentions of reasonableness, and that there was no reason to grant Morton another opportunity to do so. This does not constitute an abuse of discretion. *See Sablan v. Dep't of Fin. of N. Mar. I.*, 856 F.2d 1317, 1322-23 (9th Cir. 1988).

[17] Morton further asserts that the district court should not have considered the leases because they were not entered at the summary judgment stage and proven as damages. Federal Rule of Civil Procedure 54(d)(2)(A) requires that "[a] claim for attorney's fees . . . must be made by motion unless the substantive law requires those fees to be proved at trial as an element of damages." The district court correctly found that California substantive law did not so require, a conclusion evidenced by California Civil Code § 1717(a) itself, which provides that "[r]easonable attorney's fees shall be fixed by the court, and shall be an element of the costs of suit." Therefore, it was not error for the district court to consider as evidence leases entered for the first time on a post-judgment motion for attorney's fees and costs.

Finally, Morton argues that the Legal Aid Foundation of Los Angeles ("LAFLA") is not entitled to attorney's fees because of a statutory prohibition on such fees, *see* 45 C.F.R. § 1642.3, another argument it failed to raise before the district court. Because, as a general rule, we do "not consider an issue not passed upon below," *Dodd v. Hood River County*, 59 F.3d 852, 863 (9th Cir. 1995) (internal quotation marks omitted), we decline to consider this challenge and affirm the district court's award of fees to LAFLA.

## IV.   CONCLUSION

We affirm the district court's grant of summary judgment to Tenants. The eviction notices are invalid for failure to comply with LARSO. LARSO is not preempted by HUD's "good cause" regulation because HUD did not intend to preempt local eviction controls when it enacted 24 C.F.R. § 982.310(d)(1)(iv) and LARSO does not pose any obstacle to the accomplishment of HUD's objectives.

We affirm the entry of the permanent injunction and the award of attorney's fees.

**AFFIRMED.**