**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

ANDREW COHEN; TIMOTHY
HORNICK; KALEAH C. ALLEN;
KIMBERLY BENJAMIN; MARK
WEILER; MATT KOPPIN; SCOTT
CISCHKE; PAUL COLETTI; KRYSTLE
FAERYN; RODOLFO CABRERA;
BRANDY DAVIS; WILLIAM ZIDE;
DAVID HEDICKER; NANCY
MAEKAWA; CATHERIN GOODWIN;
KATHLEEN BOGGS; MARK KUNZE;
ARIANA RYAN; BECKY
WELLINGTON; M. GAIL SUNDELL;
VICTOR PERLMAN; ZACHARY
GOMOLEKOFF; GLENN JACOBS; JUNE
A. HALL,
                 *Plaintiffs-Appellants*,

                    v.

APPLE INC.,
                 *Defendant-Appellee*,

                   and

SAMSUNG ELECTRONIC AMERICA,
INC.,
                   *Defendant.*

No. 20-17307

D.C. No.
3:19-cv-05322-
WHA

OPINION

Appeal from the United States District Court
for the Northern District of California
William Alsup, District Judge, Presiding

Argued and Submitted December 10, 2021
Pasadena, California

Filed August 26, 2022

Before:  William A. Fletcher, Johnnie B. Rawlinson, and
John B. Owens, Circuit Judges.

Opinion by Judge W. Fletcher

## SUMMARY[*]

**Preemption / Federal Communications Commission**

The panel affirmed the district court's summary judgment for Apple Inc., based on preemption of the state-law claims by federal law, in an action bought by plaintiffs, who are iPhone users, alleging that Apple breached state tort and consumer-fraud laws by misrepresenting and failing to disclose the amount of radiofrequency ("RF") radiation emitted by iPhones.

A regulatory scheme established by a Federal Communications Commission 1996 RF Order set exposure limits that included cell phones, and it remains largely intact

[*] This summary constitutes no part of the opinion of the court.  It has been prepared by court staff for the convenience of the reader.

today. Plaintiffs alleged that RF radiation emitted by iPhones regularly exceeded the federal exposure limit, and they brought eight claims against Apple under state tort and consumer-fraud laws. The district court held that plaintiffs' state-law claims were preempted by federal law.

The panel held that the Hobbs Act did not deprive the district court of jurisdiction. The panel rejected Apple's argument that the Hobbs Act broadly granted exclusive jurisdiction to courts of appeals over private suits that implicated the substance of agency determinations, and divested district courts of jurisdiction to pass on any issue that would require them to decide on a determination made in an FCC final order. Plaintiffs in this case did not challenge the validity of any of the FCC's final orders, either directly or indirectly. The issue in this case was whether the FCC's concededly valid orders had preemptive effect. A holding that the FCC orders do, or do not, preempt plaintiffs' state-law claims had no effect on their validity.

Turning to the merits of the appeal, the panel first addressed plaintiffs' argument that the FCC promulgated its RF Orders under the National Environmental Policy Act ("NEPA"), which was a purely procedural statute with no preemptive force, and therefore regulations promulgated under NEPA did not preempt plaintiffs' state-law causes of action. The panel agreed with plaintiffs that NEPA was a purely procedural statute and that it had no preemptive force. However, the panel did not agree with plaintiffs that the FCC's RF Orders were promulgated under NEPA. The panel held that the twin Communications Acts, the Communications Act of 1934 and the Telecommunications Act of 1996, granted to the FCC broad regulatory powers over wireless communications devices. The 1996 Act

directed the FCC to complete rulemaking for RF radiation that had already been initiated under the 1934 Act. NEPA, by contrast, granted no affirmative regulatory powers over wireless communications.

Next, plaintiffs argued that even if the FCC's RF Orders were promulgated under either, or both, of the two Communications Acts, the savings clauses in those Acts preserved their state-law causes of action. Specifically, first, plaintiffs argued that the 1934 Act did not authorize preemption by regulations promulgated under the Act, and therefore their state-law causes of action were not preempted by the FCC's Orders. The panel held that a federal statute need not specify its preemptive force in order for the statute to have such a force, and Congress did not need to expressly delegate preemptive authority to the FCC for its regulations to preempt state law. The operative question was whether the agency meant to preempt the state law. The intent to preempt need not be express. Under the doctrine of implied conflict preemption, the agency's statutorily authorized regulations will preempt any conflicting state or local law. The panel held that the conflict between the FCC's RF radiation regulations and plaintiffs' state law claims posed a sufficient obstacle to the full accomplishment of the FCC's objectives. The savings clause in § 414 of the 1934 Act did not help plaintiffs. The panel concluded that the FCC's regulations under the 1934 Act, setting upper limits on the levels of permitted RF radiation, preempted state laws that imposed liability premised on levels of radiation below the limits set by the FCC.

Second, plaintiffs argued that the preemptive scope of the FCC's radiation regulations could not be determined solely by consulting the 1934 Act. The panel disagreed, and held

that the scope of preemption of the FCC's RF regulations was controlled by the 1934 Act, and the preemption provisions of the 1996 Act were irrelevant. The savings clause in Section 332(c)(7)(A) of the 1996 Act was a narrowly focused savings clause and had nothing to do with RF radiation emissions from cell phones. The general savings clause in Section 601 of the 1996 Act by its very terms applied only to the 1996 Act and does not apply to the 1934 Act.

## COUNSEL

Matthew W.H. Wessler (argued) and Linnet Davis-Stermitz, Gupta Wessler PLLC, Washington, D.C.; Elizabeth A. Fegan and Jessica H. Meeder, Fegan Scott LLC, Chicago, Illinois; for Plaintiffs-Appellants.

Joseph R. Palmore (argued) and Adam L. Sorensen, Morrison & Foerster LLP, Washington, D.C.; William F. Tarantino and James R. Sigel, Morrison & Foerster LLP, San Francisco, California; for Defendant-Appellee.

Leah M. Nicholls, Public Justice P.C., Washington, D.C., for Amicus Curiae Public Justice.

Scott L. Nelson and Allison M. Zieve, Public Citizen Litigation Group, Washington, D.C., for Amicus Curiae Public Citizen.

Joshua S. Turner, Megan L. Brown, and William K. Lane III, Wiley Rein LLP, Washington, D.C.; Paul V. Lettow and Stephanie A. Maloney, U.S. Chamber Litigation Center, Washington, D.C.; for Amicus Curiae Chamber of Commerce of the United States of America.

Terrence J. Dee and Jessica J. Thomas, McDermott Will & Emery LLP, Chicago, Illinois, for Amicus Curiae CTIA—The Wireless Association.

---

**OPINION**

W. FLETCHER, Circuit Judge:

Cell phones emit radiofrequency ("RF") radiation in the course of their ordinary operation. Pursuant to the Communications Act of 1934 and the Telecommunications Act of 1996 ("twin Communications Acts"), the Federal Communications Commission ("FCC") has promulgated regulations establishing RF radiation standards for cell phones.

Plaintiffs-appellants ("plaintiffs") Andrew Cohen and other individuals are users of iPhones manufactured by defendant-appellee Apple Inc. Plaintiffs brought suit against Apple in the district court, alleging that Apple breached state tort and consumer-fraud laws by misrepresenting and failing to disclose the amount of RF radiation emitted by iPhones. The district court entered summary judgment for Apple, holding that the plaintiffs' state-law claims are preempted by federal law.

We have jurisdiction under 28 U.S.C. § 1291 and affirm. We hold that the district court had subject matter jurisdiction and that plaintiffs' claims are preempted.

## I.  Background

We begin with an overview of RF radiation, of the relevant statutory structure, and of FCC regulation of devices that emit RF radiation.

### A.  RF Radiation

Like radios and televisions, cell phones rely on radiofrequency electromagnetic waves, otherwise known as RF radiation, to receive signals.  Cell phones also emit RF radiation to send signals.  RF radiation is a subset of electromagnetic radiation.  There are two forms of electromagnetic radiation: ionizing and non-ionizing. Ionizing radiation can be extremely dangerous.  Among other things, it can alter a person's DNA.  Non-ionizing radiation is much less dangerous and is incapable of damaging DNA. However, high levels of non-ionizing RF radiation can cause biological effects by increasing the temperature of tissues. Federal Communications Commission, *RF Safety FAQ*, https://www.fcc.gov/engineering-technology/electromagnet ic-compatibility-division/radio-frequency-safety/faq/rf-safety [https://perma.cc/DD6C-3SGM] (last visited July 18, 2022). For example, RF radiation is used to heat food in microwave ovens.  *Id.*  Cell phones emit non-ionizing RF radiation, but not at high enough levels to cause thermal effects.  *Id.*

The effects of non-thermal RF radiation on human health are controverted.  *Id.*  While some studies have described adverse biological effects resulting from exposure to low levels of RF radiation at levels emitted by cell phones, many of these effects could not be replicated in later studies.  *Id.* Current FCC regulations for cell phones set RF radiation

limits far below the level at which adverse biological effects in laboratory animals have been observed.

## B.  Statutory Background

Congress created the FCC through the Communications Act of 1934 ("1934 Act"), Pub. L. No. 73-416, 48 Stat. 1064 (codified as amended at 47 U.S.C. § 151 *et seq.*).  The 1934 Act, as amended, instructed the FCC "to make available . . . a rapid, efficient, Nation-wide, and world-wide wire and radio communication service with adequate facilities at reasonable charges," for three purposes: (1) national defense, (2) "promoting safety of life and property through the use of wire and radio communications," and (3) "securing a more effective execution of this policy by centralizing authority" previously granted to multiple agencies and "granting additional authority with respect to interstate and foreign commerce in wire and radio communication."  47 U.S.C. § 151.  The 1934 Act, as amended, declared it a national policy "to encourage the provision of new technologies and services to the public."  *Id.* § 157(a).

The 1934 Act "endowed the [FCC] with comprehensive powers to promote and realize the vast potentialities of radio."  *Nat'l Broad. Co. v. United States*, 319 U.S. 190, 217 (1943).  The Act, as amended, authorized the FCC to "[m]ake such rules and regulations and prescribe such restrictions and conditions, not inconsistent with law, as may be necessary to carry out the [statutory] provisions."  47 U.S.C. § 303(r); *see also id.* § 154(i) ("The Commission may perform any and all acts, make such rules and regulations, and issue such orders, not inconsistent with this chapter, as may be necessary in the execution of its functions.").  The 1934 Act also authorized the FCC, "as public convenience, interest, or necessity

requires," to "[r]egulate the kind of [radio] apparatus to be used with respect to its external effects and the purity and sharpness of the emissions from each station and from the apparatus therein." *Id.* § 303(e).

The 1934 Act contains a general savings clause. It provides: "Nothing in this chapter contained shall in any way abridge or alter the remedies now existing at common law or by statute, but the provisions of this chapter are in addition to such remedies." *Id.* § 414.

In 1996, Congress passed the Telecommunications Act ("1996 Act"). Telecommunications Act of 1996, Pub. L. No. 104-104, 110 Stat. 56. When the 1996 Act was passed, the FCC had initiated but had not completed a rulemaking proceeding concerning RF radiation. The 1996 Act directed the FCC to "complete action . . . to prescribe and make effective rules regarding the environmental effects of radio frequency emissions" within 180 days after the enactment of the Act. *Id.* § 704(b), 110 Stat. at 152.

The 1996 Act limits the FCC's authority where its regulations would conflict with state and local land-use regulations. A specific savings clause provides, "[N]othing in this chapter shall limit or affect the authority of a State or local government or instrumentality thereof over decisions regarding the placement, construction, and modification of personal wireless service facilities." 47 U.S.C. § 332(c)(7)(A). The Conference Report of the 1996 Act describes § 332(c)(7) as "prevent[ing FCC] preemption of local and State land use decisions and preserv[ing] the authority of State and local governments over zoning and land use matters." H.R. Rep. No. 104-458, at 207–08 (1996) (Conf. Rep.). That is, the limitation placed on the FCC's

preemptive powers by § 332(c)(7) "relate[s] to local land use regulations and [is] not intended to limit or affect the Commission's general authority over radio telecommunications, including the authority to regulate the construction, modification and operation of radio facilities." *Id.* at 209.

The 1996 Act also contains a general savings clause. It provides: "This Act and the amendments made by this Act shall not be construed to modify, impair, or supersede Federal, State, or local law unless expressly so provided in such Act or amendments." 1996 Act § 601(c)(1), 110 Stat. at 143. The savings clause is not codified in the United States Code, but is included as part of the notes to 47 U.S.C. § 152.

The Hobbs Act governs judicial review of FCC final orders. Under the Hobbs Act, federal courts of appeals (except the Federal Circuit) have "exclusive jurisdiction to enjoin, set aside, suspend (in whole or in part), or to determine the validity of," *inter alia*, "all final orders of the Federal Communications Commission made reviewable by [47 U.S.C. § 402(a)]." 28 U.S.C. § 2342; *see also* 47 U.S.C. § 402(a) (providing judicial review of the FCC's orders and decisions, including "[a]ny proceeding to enjoin, set aside, annul, or suspend any order of the [FCC]").

FCC regulatory actions are subject to the National Environmental Policy Act ("NEPA"). For "[f]ederal actions significantly affecting the quality of the human environment," NEPA requires federal agencies to include "a detailed statement" regarding the "environmental impact of the proposed action." 42 U.S.C. § 4332(2)(C)(i). NEPA "does not mandate particular results" but "imposes only procedural requirements on federal agencies with a particular focus on

requiring agencies to undertake analyses of the environmental impact of their proposals and actions." *Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 756–57 (2004) (first quoting *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989); and then citing *id.* at 349–50). Because the licensing of equipment that emits RF radiation may significantly affect the environment, NEPA obligates the FCC in such cases to consider the environmental impact of its proposed actions with respect to licensing.

### C. FCC Regulation of Devices that Emit RF Radiation

In 1979, the FCC issued a notice of inquiry ("1979 Notice of Inquiry") to gather information relevant to "its regulatory responsibility to promote communications by radio in light of the increased concern about the biological effects of radio frequency radiation." *In re* Responsibility of the Federal Communications Commission to Consider Biological Effects of Radio Frequency Radiation When Authorizing the Use of Radio Frequency Devices, 72 F.C.C.2d 482, 482, ¶ 1 (June 15, 1979).

The 1979 Notice of Inquiry was based on the FCC's responsibilities under two statutes. First, the 1934 Act directs the FCC "to promote the use of radio communications service . . . as the public convenience, interest, or necessity requires," and imposes on the FCC the "statutory obligation to make available, so far as possible a rapid efficient communication service at reasonable charges and to prevent interference between stations." *Id.* at 487–88, 489, ¶¶ 12, 16 (internal ellipses and quotation marks omitted). The FCC noted that, in fulfilling its statutory mandate under the 1934 Act, "[a] balance must be achieved between serving the public interest by fulfilling its needs for communications services and

adequately protecting the populace against potentially adverse biological effects that may be attributable to excessive RF radiation." *Id.* at 489, ¶ 17. Second, the FCC was required to comply with NEPA. The FCC noted its "explicit responsibilities under NEPA." *Id.* at 488, ¶ 13.

In 1982, pursuant to its 1979 Notice of Inquiry, the FCC issued a notice of proposed rulemaking ("1982 NPRM") regarding the biological effects of RF radiation. *In re* Responsibility of the Federal Communications Commission to Consider Biological Effects of Radiofrequency Radiation When Authorizing the Use of Radiofrequency Devices, 89 F.C.C.2d 214 (Feb. 18, 1982). The 1982 NPRM proposed expanding the definition of "major actions" that would subject RF radiation-emitting devices to FCC licensing requirements. *Id.* at 215, ¶ 2. The FCC identified the "legal basis" for its 1982 NPRM as follows:

> The action proposed is based on the obligations imposed on the [FCC] by the National Environmental Policy Act of 1969 and is in furtherance of §§ 4(i) and 303(r) of the Communications Act of 1934, as amended, which permits the [FCC] to make rules and regulations not inconsistent with other existing laws, as may be necessary in the execution of its functions, with the additional view of securing the public welfare.

*Id.* pt. VI(3), at 255 (citation omitted). The 1982 NPRM acknowledged that NEPA required the FCC "to consider whether the equipment and operations it authorizes will 'significantly affect the quality of the human environment.'" *Id.* at 251, ¶ 183 (quoting 42 U.S.C. § 4332(2)(c)).

In 1985, the FCC issued an order ("1985 RF Order") amending its "rules implementing" NEPA. *In re* Responsibility of the Federal Communications Commission to Consider Biological Effects of Radiofrequency Radiation When Authorizing the Use of Radiofrequency Devices, 100 F.C.C.2d 543, 543, ¶ 1 (Mar. 14, 1985). The 1985 RF Order adopted the 1982 *Radio Frequency Protection Guides* drafted by the American National Standards Institute ("ANSI"). *Id.*; *see id.* at 547, ¶ 9. In adopting the ANSI guidelines as a standard, the FCC noted: "Although we have neither the expertise nor the jurisdiction to *develop* our own radiation exposure guidelines, we believe . . . that the [FCC] does have the expertise and authority to *recognize* technically sound standards promulgated by reputable and competent organizations such as ANSI." *Id.* at 551, ¶ 25 (emphasis in the original).

The 1985 RF Order used the ANSI standard as a "triggering mechanism for environmental assessment." *Id.* at 560, ¶ 51. Only applications for FCC authorization of radio and broadcast facilities not in compliance with the ANSI standard would require a thorough environmental-impact analysis, including the submission of a narrative environmental statement. *Id.* at 560–61, ¶¶ 51–54. The 1985 RF Order excluded from its requirements any "relatively low-powered communications systems" such as mobile devices, which had a low likelihood of causing exposure exceeding the ANSI standard. *In re* Responsibility of the Federal Communications Commission to Consider Biological Effects of Radiofrequency Radiation When Authorizing the Use of Radiofrequency Devices, 2 FCC Rcd. 2064, 2065, ¶¶ 14–15 (Apr. 9, 1987); *see* 1985 RF Order, 100 F.C.C.2d at 561, ¶ 54. The ANSI standard, which the FCC adopted through its 1985 RF Order, explicitly excluded "low power devices such as

hand-held, mobile, and marine radio transceivers" on the ground that while "[t]hese devices may emit localized fields exceeding the protection guides, [they] will result in a significantly lower rate of energy absorption than allowed for the whole body average."   ANSI, American National Standard Safety Levels with Respect to Human Exposure to Radio Frequency Electromagnetic Fields, 300 kHz to 100 GHz 10 (1982).

The FCC identified the "legal basis" for its 1985 RF Order as follows:

> This action is based on the obligations imposed on the [FCC] by NEPA, and is in furtherance of §§ 4(i), 4(j), and 303(r) of the Communications Act of 1934, as amended. These provisions permit the [FCC] to make rules and regulations not inconsistent with other existing laws, "as may be necessary in the execution of its functions," and "to carry out the provisions of" the Communications Act.

1985 RF Order, 100 F.C.C.2d at 565 (citations omitted) (first quoting 47 U.S.C. § 154(i); and then quoting 47 U.S.C. § 303(r)).  The FCC identified two objectives in its 1985 RF Order:   (1) "to clarify its policy with regard to potential hazards from RF radiation emitted by transmitting facilities that [it] license[s] or authorize[s];" and (2) "to comply with our legal obligations under NEPA." *Id.* at 564.

In 1992, ANSI updated its guidelines, narrowing the scope of the exclusion of low-powered devices. In 1993, the FCC issued a notice of proposed rulemaking ("1993 NPRM")

to adopt ANSI's updated 1992 guidelines, noting that the narrower exclusion for low-powered devices was more protective than the broader exclusion in ANSI's 1982 guidelines. *In re* Guidelines for Evaluating the Environmental Effects of Radiofrequency Radiation, 8 FCC Rcd. 2,849, 2,849, 2,851, ¶¶ 1, 14 (Apr. 8, 1993). The FCC identified the "legal basis" for its 1993 NPRM as follows:

> This action is a result of the [FCC's] legal obligations under the NEPA to provide the means by which to evaluate [FCC] actions with respect to environmental significance, and it is in furtherance of Sections 4(i), 4(j), and 303(r) of the Communications Act of 1934, as amended.

*Id.* at 2,854, ¶ 31(C) (citations omitted).

After issuance of the 1993 NPRM and while the FCC's rulemaking was pending, Congress enacted the Telecommunication Act of 1996. The 1996 Act directed the FCC to "complete action . . . to prescribe and make effective rules regarding the environmental effects of radio frequency emissions" within 180 days after the effective date of the Act. 1996 Act § 704(b), 110 Stat. at 152.

In 1996, the FCC issued an order ("1996 RF Order") adopting new RF radiation standards applicable to low-powered portable devices, including cell phones. *In re* Guidelines for Evaluating the Environmental Effects of Radiofrequency Radiation, 11 FCC Rcd. 15,123 (Aug. 1, 1996). The 1996 RF Order noted that ANSI had adopted updated RF radiation guidelines in 1992, and that the updated ANSI standard was "more restrictive in the amount of

environmental RF exposure permitted." *Id.* at 15,126, ¶ 8. The more protective 1992 ANSI standard provided two tiers of exposure criteria: (1) controlled environments, in which those exposed to RF radiation are aware of their potential for exposure (for example, as a condition of their employment), and (2) uncontrolled environments, in which exposed individuals have no knowledge or expectation that their RF radiation exposure may exceed permitted levels. *Id.* at 15,126, ¶ 8, 15,136, ¶ 35. The updated standard mandated a specific absorption rate ("SAR") limit of 0.4 W/kg as averaged over the whole body and 8 W/kg for peak localized exposure (i.e., for a specific area of the body) for cell phones in controlled environments. *Id.* at 15,140, ¶ 46. It mandated an SAR limit of 0.08 W/kg for whole-body average exposure and 1.6 W/kg for peak localized exposure for cell phones in uncontrolled environments. *Id.*

The 1996 RF Order adopted the distinction drawn by the 1992 ANSI guidelines between controlled/uncontrolled environments. *Id.* at 15,139, ¶ 42. It also adopted the ANSI guidelines' requirements for low-power devices whose radiating structure is in direct contact with or within 20 centimeters of the human body under conditions of normal use (e.g., cell phones). *Id.* at 15,146–47, ¶¶ 62–63. Because most low-power, portable devices were intended for use by consumers rather than solely in the workplace, the FCC mandated a 1.6 W/kg maximum RF exposure for cell phones, and routine SAR evaluation "either by laboratory measurement techniques or by computational modeling, prior to equipment authorization or use." *Id.* at 15,147, ¶ 65.

The FCC's 1996 RF Order satisfied FCC's obligations under § 704(b) of the 1996 Act, which directed the FCC to "prescribe and make effective rules regarding the

environmental effects of radio frequency emissions" within 180 days. 1996 Act § 704(b), 110 Stat. at 152. The FCC noted that the updated RF radiation guidelines "will protect the public and workers from exposure to potentially harmful RF fields." 1996 RF Order, 11 FCC Rcd. at 15,124, ¶ 1. The FCC also noted that the guidelines "will be of benefit both to the public and to the telecommunications industry [because t]hey will provide assurance that recent scientific knowledge is taken into account regarding future decisions on approval of FCC-authorized facilities and equipment." *Id.* at 15,184, ¶ 169. The FCC identified provisions of the 1934 Act, as amended, as its statutory authority to issue the 1996 RF Order. *Id.* at 15,185, ¶ 171.

The regulatory scheme established by the FCC's 1996 RF Order remains largely intact today. Under 47 C.F.R. § 2.1093(d)(1), "[a]pplications for equipment authorization of portable RF sources subject to routine environmental evaluation must contain a statement confirming compliance with the limits specified in § 1.1310 . . . ." In turn, 47 C.F.R. § 1.1310(c) provides: "The SAR limits for general population/uncontrolled exposure are 0.08 W/kg, as averaged over the whole body, and a peak spatial-average SAR of 1.6 W/kg, averaged over any 1 gram of tissue." If the FCC determines that a device, such as the iPhone, complies with its RF radiation guidelines (tested at maximum power and under more extreme conditions than normal use) and other technical standards, the agency issues a certification authorizing sale of the device. 47 C.F.R. § 2.907. If the device "would cause human exposure to levels of RF radiation in excess of the limits in § 1.1310," the applicant for equipment authorization must prepare an environmental assessment. *Id.* § 1.1307(b)(1)(i)(C). The proposed device can still be approved for sale if the FCC determines that it

will not have a significant impact on the human environment. *Id.* § 1.1308(d).  In practice, however, the FCC sees the RF radiation limits as a "de facto compliance requirement." 1996 RF Order, 11 FCC Rcd. at 15226.  According to an amicus brief filed by the United States before the Supreme Court in 2011, cell phone manufacturers "have never attempted to obtain approval to sell non-compliant phones by submitting an [environmental assessment]" since the promulgation of the FCC's RF radiation rules.  Brief for the United States as Amicus Curiae at 19–20, *Farina v. Nokia, Inc.*, 565 U.S. 928 (2011) (No. 10-1064), 2011 WL 3799082, at *19–20.

In 2013, the FCC issued a notice of inquiry ("2013 Notice of Inquiry") soliciting public comments about whether the 1996 RF exposure limits should be reassessed.  *In re* Reassessment of Federal Communications Commission Radiofrequency Exposure Limits and Policies, 28 FCC Rcd. 3,498, 3,498, ¶ 1 (Mar. 29, 2013).  The 2013 Notice of Inquiry affirmed the FCC's previous view that it must strike a balance between public safety and the public's access to new telecommunications services.  The FCC explained:

> The [FCC] has a responsibility to provide a proper balance between the need to protect the public and workers from exposure to potentially harmful RF electromagnetic fields and the requirement that industry be allowed to provide telecommunications services to the public in the most efficient and practical manner possible.  The intent of our exposure limits is to provide a cap that both protects the public based on scientific consensus and allows for efficient and practical

implementation of wireless services. The present [FCC] exposure limit is a "bright-line rule." That is, so long as exposure levels are below a specified limit value, there is no requirement to further reduce exposure. The limit is readily justified when it is based on known adverse health effects having a well-defined threshold, and the limit includes prudent additional safety factors (e.g., setting the limit significantly below the threshold where known adverse health effects may begin to occur). Our current RF exposure guidelines are an example of such regulation, including a significant "safety" factor, whereby the exposure limits are set at a level on the order of 50 times below the level at which adverse biological effects have been observed in laboratory animals as a result of tissue heating resulting from RF exposure.

*Id.* at 3,582, ¶ 236 (footnote omitted) (internal quotation marks omitted).

In 2019, the FCC issued an order and resolution of notice of inquiry ("2019 RF Order") that left intact its 1996 RF radiation guidelines, including for cell phones. *In re Proposed Changes in the Commission's Rules Regarding Human Exposure to Radiofrequency Electromagnetic Fields*, 34 FCC Rcd. 11,687, 11,688, ¶ 2 (Dec. 4, 2019); *id* at 11,696, ¶ 14. In *Environmental Health Trust v. FCC*, 9 F.4th 893 (D.C. Cir. 2021), the D.C. Circuit granted in part a petition challenging the 2019 RF Order and remanded to the FCC for further proceedings. The D.C. Circuit held that the FCC "failed to provide a reasoned explanation for its

determination that its guidelines adequately protect against the harmful effects of exposure to radiofrequency radiation unrelated to cancer." *Id.* at 900.

### D.  Factual and Procedural Background

Plaintiffs-appellants Andrew Cohen and other individuals are iPhone users.  Defendant-appellee Apple, Inc., is a California corporation.  Apple designs, manufactures, and sells consumer electronic products, including the iPhone.

In August 2019, the *Chicago Tribune* reported results of its independent investigation of RF radiation levels of popular cell phones sold in the United States.  Sam Roe, *We Tested Popular Cellphones for Radiofrequency Radiation. Now the FCC Is Investigating.*, Chi. Tribune, Aug. 21, 2019, https://www.chicagotribune.com/investigations/ct-cell-phone-radiation-testing-20190821-72qgu4nzlfda5kyuhteiieh4da-story.html.  According to the report, RF radiation exposure from Apple's iPhone 7 "measured over the legal safety limit and more than double" what Apple found from its own testing.  *Id.*

Two days after publication of the *Tribune*'s report, plaintiffs filed a putative class action in the district court seeking to represent all iPhone users in the United States. Within a few weeks, a nearly identical complaint was filed in the district court on behalf of different named plaintiffs.  The district court consolidated the two actions, and plaintiffs filed a consolidated amended class action complaint.

The complaint alleged that RF radiation emitted by iPhones regularly exceeded the federal exposure limit.  The complaint relied heavily on the *Tribune*'s testing of the RF

radiation emitted by iPhones, citing the *Tribune*'s report of data showing that RF radiation exposure to iPhone 7 models averaged 2.59 W/kg and 3.225 W/kg in two tests, both of which exceeded the federal exposure limit of 1.6 W/kg. Plaintiffs' counsel also conducted their own testing, using the same lab the *Tribune* had used. They tested additional iPhone models, and they tested at a zero-millimeter distance to replicate use of the iPhone against the skin. According to their testing, RF radiation emitted by iPhone 7 models reached 3.6 W/kg at a 5-millimeter separation distance. Based on data obtained from this testing, the complaint alleged that Apple engaged in "deceptive and misleading" marketing by advertising iPhones as safe when used against the body (for example, by advertising the iPhone as "the Internet in your pocket" or showing people holding iPhones in their bare hands in commercials).

The *Tribune*'s story prompted the FCC to conduct further testing of iPhones. In December 2019, the FCC published the results of its own testing. The FCC's further testing measured RF radiation exposure from iPhones as well within the safety limits. The testing revealed no evidence of violation of the FCC's technical standards.

Plaintiffs' complaint alleged eight claims against Apple under state tort and consumer-fraud laws: (1) Apple intentionally misrepresented the safety of iPhones despite knowing that their RF radiation exceeded federal limits; (2) Apple failed to exercise reasonable care in not warning plaintiffs about unsafe RF radiation emitted by iPhones; (3) Apple violated California's Unfair Competition Law by failing to disclose that iPhones emitted RF radiation at unsafe levels or levels exceeding the federal limit; (4) Apple violated California's Consumers Legal Remedies Act by failing to

disclose that iPhones emitted RF radiation at unsafe levels or levels exceeding the federal limit; (5) Apple violated California's false advertising law by failing to disclose that iPhones emitted RF radiation at unsafe levels or levels exceeding the federal limit; (6) Apple violated various states' consumer protection acts due to its dissemination of deceptive and misleading advertising materials; (7) Apple was unjustly enriched because plaintiffs did not receive products as marketed by Apple; and (8) Apple breached its implied warranty that iPhones were safe for ordinary use. The complaint sought class certification, a finding of liability against Apple, the establishment of a medical monitoring fund under claims (1) and (2), money damages, appropriate injunctive relief, and attorney's fees.

On January 2, 2020, Apple moved to dismiss plaintiffs' complaint. Apple argued, *inter alia*, that plaintiffs lacked Article III standing and, assuming standing, that federal law preempted plaintiffs' claims. Following a hearing, the district court found that Apple had presented matters outside of the pleadings. The district court converted Apple's motion to dismiss into a motion for summary judgment.

The district court invited the FCC to participate as amicus curiae. The FCC filed a statement of interest on April 13, 2020, in which it made three main arguments. First, the FCC argued that "[t]o the extent that plaintiffs' claims effectively challenge the adequacy or reasonableness of FCC testing procedures for assessing compliance with RF limits, the [district court] lacks jurisdiction" under 28 U.S.C. § 2342(1). Second, the FCC argued that "plaintiffs' claims are preempted to the extent they suggest that RF emissions from cell phones certified by the FCC for sale in the United States are unsafe." The FCC argued that the FCC's regulations

reflected congressional expectation that "the FCC . . . use its expert judgment to balance different policy objectives," including "between 'adequate safeguards of the public health' and 'speed[y] deployment of competitive wireless telecommunications services.'" The FCC contended that litigation such as plaintiffs' "is especially disruptive to the FCC's certification program because plaintiffs seek relief based on third-party testing that may have inaccurately measured the RF emissions of Apple's iPhones." Third, the FCC argued that the district court had no jurisdiction over plaintiffs' state-law claims that Apple failed to disclose that iPhones emitted RF radiation at unsafe levels or levels exceeding the FCC's RF limits. Even if the district court had jurisdiction, the FCC argued, federal law preempted those claims.

In its statement of interest, the FCC asserted that Apple's iPhone (including the iPhone 7, the iPhone X, and the iPhone XS) complied with federal RF radiation guidelines. The FCC stated that it had tested each iPhone model for the specific bands of operations investigated by the *Chicago Tribune*, and had found that the tested phones produced maximum measured exposure of 0.946 W/kg for the iPhone 7, 0.799 W/kg for the iPhone X, and 1.35 W/kg for the iPhone XS—all well under the FCC's permitted maximum of 1.6 W/kg.

In October 2020, the district court entered summary judgment for Apple. The district court held that the FCC promulgated substantive RF radiation regulations under the 1934 Act rather than under NEPA. The district court found that the 1996 Act's general savings clause, 47 U.S.C. § 253, and § 601(c) of the 1996 Act did not change the normal operation of conflict-preemption analysis or limit the FCC's

statutory authority to regulate RF radiation.  The district court concluded that the FCC's regulation of RF radiation, as part of its equipment-authorization regime, preempted plaintiffs' claims.  In reaching this conclusion, the district court relied on *Farina v. Nokia, Inc.*, 625 F.3d 97, 133–34 (3d Cir. 2010), in which the Third Circuit held that the FCC's regulations preempted similar claims under state law.

Plaintiffs timely appealed.  On appeal, they concede that RF radiation emissions from Apple's iPhone are at levels below the maximum permitted by FCC regulations.  Their primary arguments on appeal are that (1) neither the 1934 Act, 1996 Act, nor NEPA gives the FCC authority to preempt state law concerning cell-phone radiofrequency radiation, and (2) the FCC's RF radiation regulations do not preempt state-law causes of action that are premised on  maximum levels of RF radiation below the maximum level set by the FCC.

## II. Standard of Review

We review a district court's grant of summary judgment *de novo*.  *See Zetwick v. County of Yolo*, 850 F.3d 436, 440 (9th Cir. 2017).  "Summary judgment is appropriate when, viewing the evidence in the light most favorable to the nonmoving party, there is no genuine dispute as to any material fact."  *Id.* (citation omitted).

## III. Analysis

### A. Subject Matter Jurisdiction Under the Hobbs Act

Under the Hobbs Act, federal courts of appeals (except the Federal Circuit) have "exclusive jurisdiction to enjoin, set

aside, suspend (in whole or in part), or to determine the validity of . . . all final orders of the [FCC] made reviewable by [47 U.S.C. § 402(a)]." 28 U.S.C. § 2342(1); *see also* 47 U.S.C. § 402(a) (providing judicial review of FCC's orders and decisions, including "[a]ny proceeding to enjoin, set aside, annul, or suspend any order of the [FCC]"). In addition to direct challenges to agency orders, the Hobbs Act grants exclusive jurisdiction to courts of appeals over suits against private parties that would require the court to enjoin, set aside, suspend, or determine the validity of a final FCC order. *Wilson v. A.H. Belo Corp.*, 87 F.3d 393, 399–400 (9th Cir. 1996); *see also Pub. Watchdogs v. S. Cal. Edison Co.*, 984 F.3d 744, 765 (9th Cir. 2020) (Nuclear Regulatory Commission order).

Apple argues that the Hobbs Act broadly grants exclusive jurisdiction to courts of appeals over private suits that implicate the substance of agency determinations. Citing two of our cases, Apple argues that "the Hobbs Act divests district courts of jurisdiction to pass on *any* issue that would require them to decide whether they 'agreed' or 'disagreed' with a determination made in an FCC final order," and that the district court therefore did not have jurisdiction over this case.

We disagree. Neither case cited by Apple goes so far. In *Wilson*, 87 F.3d at 395, plaintiffs brought suit in district court against California television stations to recover payments for campaign advertisements that allegedly exceeded limits imposed by § 315(b) of the 1934 Act. The FCC had issued a declaratory ruling asserting its exclusive authority to adjudicate and enforce all claims under § 315(b). *Id.* We held that the Hobbs Act barred jurisdiction because the plaintiffs, in effect, had asked the district court to set aside or

determine the validity of the FCC's declaratory ruling. *Id.* at 400. Similarly, in *Public Watchdogs*, 984 F.3d at 765, the plaintiff brought state-law claims against utility companies, alleging mishandling of nuclear waste, and arguing that the Nuclear Regulatory Commission ("NRC") had improperly granted a licensing amendment. We held that the Hobbs Act barred the plaintiff's "veiled challenge" to the NRC license grant in the district court. *Id.* In both cases, plaintiffs' lawsuits in effect would have required the district court to set aside or determine the validity of an agency final order.

By contrast, plaintiffs in this case do not challenge the validity of any of the FCC's final orders, either directly or indirectly. The issue in this case is whether the FCC's concededly valid orders have preemptive effect. A holding that the FCC orders do, or do not, preempt plaintiffs' state-law claims has no effect on their validity.

We therefore hold that the Hobbs Act does not deprive the district court of jurisdiction, and we reach the merits of the appeal.

## B. Preemption

Plaintiffs argue on two grounds that their state-law claims are not preempted. First, they argue that the FCC promulgated its RF Orders under NEPA. They argue that because NEPA is a purely procedural statute with no preemptive force, regulations promulgated under NEPA do not preempt their state-law causes of action. Second, they argue that even if the FCC's RF Orders were promulgated

under either, or both, of the twin Communications Acts, the savings clauses in those Acts preserve their state-law causes of action.

We disagree with both grounds.

### 1. NEPA

We agree with plaintiffs that NEPA is a purely procedural statute and that it has no preemptive force. However, we do not agree with plaintiffs that the FCC's RF Orders were promulgated under NEPA.

The twin Communications Acts grant to the FCC broad regulatory powers over wireless communication devices. The 1934 Act authorizes the FCC to: (1) "Regulate the kind of apparatus to be used with respect to its external effects and the purity and sharpness of the emissions," 47 U.S.C. § 303(e); (2) "Make such rules and regulations and prescribe such restrictions and conditions, not inconsistent with law, as may be necessary to carry out the provisions of [the Communications Acts]," *id.* § 303(r); and (3) "[P]erform any and all acts, make such rules and regulations, and issue such orders, not inconsistent with this chapter, as may be necessary in the execution of its functions," *id.* § 154(i).

The 1996 Act directed the FCC to complete rulemaking for RF radiation that had already been initiated under the 1934 Act. Section 704(b) of the 1996 Act provides: "Within 180 days after the enactment of this Act, the [FCC] shall complete action in ET Docket 93-62 to prescribe and make effective rules regarding the environmental effects of radio frequency emissions." 1996 Act § 704(b), 110 Stat. at 152. Section 704(b) does not itself grant rulemaking authority.

Rather, it requires the FCC to complete its preexisting rulemaking proceeding initiated in the 1993 NPRM under the authority of the 1934 Act.  *See Farina*, 625 F.3d at 128 & n.28.

The FCC has been consistent in stating that its authority to regulate RF radiation-emitting communication devices comes from the 1934 Act.  The FCC wrote in the 1982 NPRM that led to its 1985 RF Order, "The action proposed is . . . in furtherance of §§ 4(i) and 303(r) of the Communications Act of 1934 . . . , which permits the [FCC] to make rules and regulations . . . as may be necessary in the execution of its functions."  1982 NPRM, 89 F.C.C.2d at 255. It wrote in connection with the 1985 RF Order itself, "This action is . . . in furtherance of §§ 4(i), 4(j), and 303(r) of the Communications Act of 1934[.]"  1985 RF Order, 100 F.C.C.2d at 565.  It wrote in the 1993 NPRM that led to its 1996 RF Order, "This action is . . . in furtherance of Sections 4(i), 4(j), and 303(r) of the Communications Act of 1934[.]" 1993 NPRM, 8 FCC Rcd. at 2854.  It wrote in its 2019 RF Order, "The [FCC's] authority to adopt and enforce RF exposure limits pursuant to the Communications Act . . . is well established."  2019 RF Order, 34 FCC Rcd. at 11,689 n.5.

NEPA, by contrast, grants no affirmative regulatory powers over wireless communications.  It is a procedural statute designed to ensure that federal actions, including regulatory actions, are reviewed for their environmental consequences. *See* 42 U.S.C. § 4332.  The FCC's 1985, 1996 and 2019 RF Orders were not authorized by NEPA.  Rather, they were constrained by NEPA.  Several of the FCC's statements reflect this understanding of NEPA.  For example, the FCC wrote in its 1985 RF Order, "This action is based on

the obligations imposed on the [FCC] by NEPA[.]" 1985 RF Order, 100 F.C.C.2d at 565. It wrote in its 1996 RF Order that it issued the order "to fulfill [its] responsibilities under NEPA." 1996 RF Order, 11 FCC Rcd. at 15,183. It wrote in its 2019 RF Order, "The Commission's authority to adopt and enforce RF exposure limits . . . consistent with NEPA is well established." 2019 RF Order, 34 FCC Rcd. at 11,689 n.5.

We therefore reject plaintiffs' argument that the FCC's RF Orders were promulgated under NEPA.

### 2. The Twin Communications Acts

Alternatively, plaintiffs argue that neither the 1934 Act nor the 1996 Act preempts their state-law claims. They make essentially two arguments. First, they argue that the 1934 Act does not provide authority to the FCC to promulgate regulations that preempt their state-law claims. Second, they argue that reading the 1934 and 1996 Acts together "makes clear that Congress did not authorize the FCC's regulations to displace state law here." We take each argument in turn.

### a. Authority under the 1934 Act

Plaintiffs argue that the 1934 Act does not authorize preemption by regulations promulgated under the Act, and that its state-law causes of action are not preempted by the FCC's orders. We disagree.

"The Supremacy Clause provides the constitutional foundation for federal authority to preempt state law." *Beaver v. Tarsadia Hotels*, 816 F.3d 1170, 1178 (9th Cir. 2016) (citing U.S. Const. art. VI, cl. 2; *Kurns v. R.R. Friction Prods. Corp.*, 565 U.S. 625, 630 (2012)). "Preemption of

state law, by operation of the Supremacy Clause, can occur in one of several ways: express, field, or conflict preemption." *Id.* (citing *Kurns*, 565 U.S. at 630–31). Absent express congressional preemption, federal law preempts state law "when the scope of a [federal] statute indicates that Congress intended federal law to occupy a field exclusively," *Kurns*, 565 U.S. at 630 (alteration in original) (quoting *Freightliner Corp. v. Myrick*, 514 U.S. 280, 287 (1995)), or where "the state law 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress,'" *Beaver*, 816 F.3d at 1179 (quoting *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372–73 (2000)). Our "preemption analysis is driven by the presumption that 'the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress.'" *Id.* (quoting *Wyeth v. Levine*, 555 U.S. 555, 565 (2009)).

A federal statute need not specify its preemptive force in order for the statute to have such force. The Supreme Court has stated, plainly and repeatedly: "A pre-emptive regulation's force does not depend on express congressional authorization to displace state law[.]" *Fid. Fed. Sav. & Loan Ass'n v. de la Cuesta*, 458 U.S. 141, 154 (1982); *see also City of New York v. FCC*, 486 U.S. 57, 64 (1988). While plaintiffs protest that "Apple dusts off two decades-old cases" (both *de la Cuesta* and *City of New York* were decided in the 1980s), the Supreme Court has never overruled either case, and they remain good law. We have cited them as providing the standard governing agency preemption. *See MetroPCS Cal., LLC v. Picker*, 970 F.3d 1106, 1117 (9th Cir. 2020); *Barrientos v. 1801–1825 Morton LLC*, 583 F.3d 1197, 1208 (9th Cir. 2009) (specifically citing *de la Cuesta*, 458 U.S. at 154, for the proposition that "[a] pre-emptive regulation's

force does not depend on express congressional authorization to displace state law"). We therefore conclude that Congress need not expressly delegate preemptive authority to the FCC for its regulations to preempt state law.

"Along with Congress, 'a federal agency acting within the scope of its congressionally delegated authority may pre-empt state regulation.'" *Barrientos*, 583 F.3d at 1208 (quoting *City of New York*, 486 U.S. at 63–64). First, for a regulation to have preemptive force, it must fall "within the scope of the [federal agency's] delegated authority," *id.* at 583 F.3d at 1208 (alteration in original) (quoting *de la Cuesta*, 458 U.S. at 154), or, in other words, it must be "statutorily authorized," *City of New York*, 486 U.S. at 64. Second, the agency must have "meant to pre-empt" state law. *MetroPCS*, 970 F.3d at 1117 (quoting *Barrientos*, 583 F.3d at 1208). "Where, as here, we consider whether a federal agency has preempted state regulation, we do not focus on Congress's 'intent to supersede state law' but instead ask 'whether [the federal agency] meant to pre-empt [the state law].'" *Id.* (quoting *Barrientos*, 583 F.3d at 1208).

Importantly, the intent to pre-empt need not be express. *Geier v. Am. Honda Motor Co.*, 529 U.S. 861, 884–85 (2000). Under the doctrine of implied conflict preemption, "[t]he statutorily authorized regulations of an agency will pre-empt any state or local law that conflicts with such regulations or frustrates the purposes thereof." *City of New York*, 486 U.S. at 63. In other words, it must be either "impossible to comply with both state and federal requirements," or the state law must stand "as an obstacle to the accomplishment and execution of the full purposes and objectives of [the federal agency]." *MetroPCS*, 970 F.3d at 1118. State law may pose such an obstacle when it disturbs a balance the federal

regulation has struck between "conflicting policies that were committed to the agency's care by the statute." *Barrientos*, 583 F.3d at 1208 (alteration in original) (quoting *City of New York*, 486 U.S. at 64). The balance struck by the federal agency should not be disturbed "unless it appears from the statute or its legislative history that [the balance] is not one that Congress would have sanctioned." *City of New York*, 486 U.S. at 64 (quoting *United States v. Shimer*, 367 U.S. 374, 383 (1961)).

As an initial matter, the plaintiffs argue that because matters of health and safety, such as the biological effects of cell phone RF radiation, fall within states' historic police powers, the presumption against preemption applies in this case. We assume, without deciding, that the presumption applies. Nevertheless, the presumption is overcome because the conflict between the FCC's RF radiation regulations and plaintiffs' state law claims poses a sufficient obstacle to the full accomplishment of the FCC's objectives. *See Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 374 n.8 (2000).

As discussed above, the FCC's RF radiation regulations were promulgated pursuant to §§ 4(i), 4(j) and 303(r) of the 1934 Act. The regulations thus fall within the scope of the agency's delegated authority under the 1934 Act. The 1934 Act grants broad authority to the FCC to promulgate regulations that strike a balance among overlapping and potentially conflicting policies. These policies include the promotion of "a rapid, efficient, [n]ation-wide, and world-wide . . . communication service," the promotion of "safety of life and property through the use of wire and radio communications," "national defense," and the encouragement of "provision of new technologies and services to the public." 47 U.S.C. §§ 151, 157(a). The FCC's RF radiation

regulations, as applied to cell phones, were intended to strike such a balance.

In its 1979 Notice of Inquiry, the FCC noted that, in fulfilling its statutory mandate under the 1934 Act, "[a] balance must be achieved between serving the public interest by fulfilling its needs for communications services and adequately protecting the populace against potentially adverse biological effects that may be attributable to excessive RF radiation." 1979 Notice of Inquiry, 72 F.C.C.2d at 489, ¶ 17. The 2013 Notice of Inquiry affirmed the FCC's previous view that it must strike a balance between public safety and the public's access to new telecommunications services. *See* 2013 Notice of Inquiry, 28 FCC Rcd. at 3,582, ¶ 236.

Plaintiffs' state-law claims would disrupt the balance struck by the FCC. In an analogous case, the Third Circuit has explained:

> The reason why state law conflicts with federal law in these balancing situations is plain. When Congress charges an agency with balancing competing objectives, it intends the agency to use its reasoned judgment to weigh the relevant considerations and determine how best to prioritize between these objectives. Allowing state law to impose a different standard permits a re-balancing of those considerations. A state-law standard that is more protective of one

> objective may result in a standard that is less
> protective of others.

*Farina*, 625 F.3d at 123.  The same reasoning applies in this case.  The FCC's adoption of specific RF radiation limits for cell phones is the result of the agency's striking a balance between the conflicting policies of public safety and the public's access to telecommunications technologies.

The savings clause in § 414 of the 1934 Act does not help plaintiffs.  We quoted it above.  For the convenience of the reader, here it is again:  "Nothing in this chapter contained shall in any way abridge or alter the remedies now existing at common law or by statute, but the provisions of this chapter are in addition to such remedies."  47 U.S.C. § 414.

On appeal, plaintiffs do not press the allegations in their complaint that Apple's iPhones emit RF radiation at levels above the maximum permitted by FCC regulations.  For purposes of appeal, they concede that Apple's iPhones comply with the FCC's RF radiation regulations.  They write, "On appeal, [plaintiffs] pursue only their claims that Apple devices are unsafe 'in spite of' compliance with federal standards and that Apple fails to disclose their dangers."  Plaintiffs' concession that Apple's iPhone complies with emission levels prescribed by the FCC is fatal to their appeal.

If plaintiffs were to press the allegations in the complaint that Apple's iPhones exceeded the maximum RF radiation levels permitted by the FCC, and were to argue that the state-law remedies they seek were premised on Apple's violations of the FCC's RF radiation standards, this would be a different appeal, and the savings clause might have some force.  *Cf. Stengel v. Medtronic Inc.*, 704 F.3d 1224, 1233 (9th Cir.

2013) (en banc). However, this is not their argument. Plaintiffs' argument on appeal is that state-law causes of action premised on RF radiation emission standards more protective than those prescribed by the FCC are not preempted.

In *Geier v. American Honda Motor Co.*, 529 U.S. 861 (2000), the Supreme Court wrote that it "has repeatedly 'decline[d] to give broad effect to saving clauses where doing so would upset the careful regulatory scheme established by federal law.'" *Id.* at 870 (quoting *United States v. Locke*, 529 U.S. 89, 106–107 (2000)). Consistently with *Geier*, we have held that § 414, the savings clause of the 1934 Act, preserves only those rights not inconsistent with the statutory requirements. *Telesaurus VPC, LLC v. Power*, 623 F.3d 998, 1010 (9th Cir. 2010). Section 414 cannot be read expansively to "abrogate the very federal regulation of mobile telephone providers that the [1934 Act] intended to create." *Id.* at 1011 (quoting *Bastien v. AT&T Wireless Servs., Inc.*, 205 F.3d 983, 987 (7th Cir. 2000)). "Said otherwise, we infer that Congress did not intend the saving provisions in a federal law to be interpreted in a way that causes the federal law 'to defeat its own objectives,'" including those implemented by federal regulations. *In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., & Prods. Liab. Litig.*, 959 F.3d 1201, 1214 (9th Cir. 2020) (quoting *Geier*, 529 U.S. at 872).

In *American Telephone & Telegraph Co. v. Central Office Telephone, Inc.*, 524 U.S. 214 (1998), the Supreme Court refused to construe § 414 as saving state-law tort and breach of contract claims from preemption under the 1934 Act's filed rate doctrine. The Court wrote:

> A claim for services that . . . directly conflict
> with the tariff—the basis for both the tort and
> contract claims here—cannot be "saved"
> under § 414. "Th[e saving] clause . . . cannot
> in reason be construed as continuing in
> [customers] a common law right, the
> continued existence of which would be
> absolutely inconsistent with the provisions of
> the act. In other words, the act cannot be held
> to destroy itself."

*Id.* at 227–28 (alteration and omission in original) (quoting *Tex. & Pac. Ry. Co. v. Abilene Cotton Oil Co.*, 204 U.S. 426, 446 (1907)).

So too here. The 1934 Act authorizes the FCC to balance the overlapping and potentially competing factors in setting safe and uniform limits for RF radiation from cell phones. Allowing state tort law to prescribe lower levels of RF radiation than the levels prescribed by the FCC would interfere with the nationwide uniformity of regulation that is the aim of the Act, and would render the FCC's statutorily mandated balancing essentially meaningless. If state law were allowed to prescribe such levels, it would "stand[] as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Beaver*, 816 F.3d at 1179 (quoting *Crosby*, 530 U.S. at 372–73).

We therefore hold that the FCC's regulations under the 1934 Act, setting upper limits on the levels of permitted RF radiation, preempt state laws that impose liability premised on levels of radiation below the limits set by the FCC.

b. Reading the 1934 and 1996 Acts Together

Plaintiffs argue that the preemptive scope of the FCC's RF radiation regulations cannot be determined solely by consulting the 1934 Act. They argue that the 1934 and 1996 Acts must be read together. They write in their brief that it was in the 1996 Act "that Congress carefully delineated the limited scope of the FCC's preemptive authority." We disagree. We hold that the scope of preemption of the FCC's RF radiation regulations is controlled by the 1934 Act, and that the preemption provisions of the 1996 Act are irrelevant.

As discussed in detail above, the FCC's RF radiation regulations were promulgated under §§ 4(i), 4(j), and 303(r) of the 1934 Act. The 1996 Act directed the FCC to complete within 180 days a pending rulemaking proceeding with respect to RF radiation for cell phones. 1996 Act § 704(b), 110 Stat. at 152. But the 1996 Act did not provide the underlying authority for adopting the RF radiation regulations. It merely directed the FCC to complete quickly the pending rulemaking proceeding under the 1934 Act.

As also discussed above, there are two preemption provisions in the 1996 Act. First, there is a narrowly focused savings clause. Section 332(c)(7)(A) of the 1996 Act provides, "[N]othing in this chapter shall limit or affect the authority of a State or local government or instrumentality thereof over decisions regarding the placement, construction, and modification of personal wireless service facilities." 47 U.S.C. § 332(c)(7)(A). This provision protects the placement, construction, and modification of state and local "facilities," such as cell phone towers, from preemption under the 1996 Act. It has nothing to do with RF radiation emissions from cell phones.

Second, there is a general savings clause.  Section 601 of the 1996 Act provides:  "*This Act* and the amendments made by *this Act* shall not be construed to modify, impair, or supersede Federal, State, or local law unless expressly so provided in such Act or amendments."  1996 Act § 601(c)(1), 110 Stat. at 143 (emphasis added).  By its plain terms, this provision applies only to "this Act"—that is, to the 1996 Act. It does not apply to the 1934 Act.

Because § 332(c)(7)(A) applies only to "facilities," and § 601(c)(1) applies only to the 1996 Act, the preemption provisions of the 1996 Act do not affect the preemptive scope of the FCC's RF radiation regulations under the 1934 Act.

Conclusion

We hold that the Hobbs Act does not deprive the district court of jurisdiction in this case.  We hold, further, that the FCC's regulations of the RF radiation of cell phones, promulgated under the 1934 Act, preempt plaintiffs' state-law claims as they are presented to us on appeal.

**AFFIRMED.**